**ROSEVILLE PLAZA LIMITED PARTNERSHIP, a Michigan Limited Partnership, Plaintiff,**

v.

**UNITED STATES GYPSUM COMPANY, a Delaware Corporation, and W.R. Grace & Co.—Conn., a Connecticut Corporation, Defendants.**

No. 91–CV–72626–DT.

United States District Court,
E.D. Michigan, S.D.

Dec. 15, 1992.

■■■■■■■■■

Philip J. Goodman, Steven G. Silverman, Birmingham, MI, Kenneth B. McClain, Independence, MO and Michael B. Serling, Birmingham, MI, for plaintiff.

Robert J. Franzinger, Zora E. Johnson, Detroit, MI, and Raymond Cullen and Gordon Cooney, Philadelphia, PA, for defendants.

## OPINION

DUGGAN, District Judge.

This is a products liability action filed by plaintiff Roseville Plaza Limited Partnership against defendant United States Gypsum Company.[1] Before the Court are defendant's motion to dismiss based upon the economic loss doctrine; motion for summary judgment based upon expiration of the statute of limitations or, in the alternative, for a separate statute of limitations trial; motion for summary judgment of plaintiff's restitution claim; and motion for summary judgment based upon lack of evidence to support plaintiff's essential allegations.[2] The Court has considered the written briefs filed in support of and in opposition to such motions, and has had the opportunity to hear arguments from counsel at an October 29, 1992, hearing. For the reasons that follow, defendant's motions shall be granted in part and denied in part.

## I. Factual and Procedural Background

Plaintiff is the owner of a shopping center located in Roseville, Michigan, known as Roseville Plaza. When Roseville Plaza was constructed in the early 1960's, beams throughout the building were covered with an asbestos-containing fireproofing material (ACFM). Plaintiff contends that defendant designed, manufactured and sold the ACFM; that the ACFM causes cancer, asbestosis and other diseases; that the ACFM suffered bonding failures and fell to the floor and/or through normal and foreseeable use released dust which caused asbestos fibers to become airborne; and that it has and will continue to spend considerable sums removing and replacing the ACFM. Plaintiff seeks compensatory damages in excess of $2,000,000 plus exemplary damages under the following theories: negligence (Count III), misrepresentation (Count IV), implied warranty of merchantability (Count VI), implied warranty of fitness (Count VII), civil conspiracy (Count VIII), nuisance (Count IX) and restitution (Count X).[3]

## II. The Economic Loss Doctrine

■ Defendant moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), for dismissal of plaintiff's complaint in its entirety arguing that the loss claimed by plaintiff is solely economic and, therefore, plaintiff's exclusive remedies are provided under the UCC. According to defendant, since plaintiff does not seek any remedies pursuant to the UCC, and since all UCC claims are barred by the UCC statute of limitations in any even,[4] plaintiff has failed

---

1. Pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii), plaintiff voluntarily dismissed former defendant Grace & Co.–Conn. from this action. (6/28/91 Voluntary Dismissal of W.R. Grace & Co.–Conn.)

2. In light of the Court's disposition of defendant's other summary judgment motions, the Court finds it unnecessary to address defendant's motion for summary judgment based upon lack of evidence to support plaintiff's essential allegations. Defendant's motion for sanctions has been addressed in a separate opinion and order.

3. Counts I and II contain jurisdictional averments and general allegations, respectively.

Plaintiff withdrew its express warranty claim (Count V) at a September 12, 1991, hearing held on defendant's Rule 12(b)(6) motion. By Order dated September 16, 1991, Judge Bernard A. Friedman (who disqualified himself from this action by Order dated August 31, 1992) denied defendant's motion and ordered that the implied warranty claims (Counts VI and VII) be limited to tort claims, as opposed to Uniform Commercial Code (UCC) claims.

4. Defendant's argument is premised upon the assumption that all of the ACFM was purchased more than four years before this action was commenced. Under the UCC, an action to recover for breach of warranty must be com-

to state a claim upon which relief may be granted. Defendant's argument was raised in its previous Rule 12(b)(6) motion, and such argument was rejected by the Court. In renewing its motion, defendant relies upon *Neibarger v. Universal Cooperatives, Inc.*, 439 Mich. 512, 486 N.W.2d 612 (1992), a recent Michigan Supreme Court decision issued after this Court ruled on defendant's prior Rule 12(b)(6) motion. Plaintiff opposes defendant's motion distinguishing this case from *Neibarger* and arguing that the economic loss doctrine does not apply to the present action.

The standard of review for a Rule 12(b)(6) motion to dismiss is "failure to state a claim upon which relief may be granted[.]" Fed.R.Civ.P. 12(b)(6). Under this standard, "the factual allegations in the complaint must be regarded as true. The claim should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir.1983), *cert. denied*, 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984) (citation omitted).

In *Neibarger*, the Michigan Supreme Court held: "[W]here a plaintiff seeks to recover for economic loss caused by a defective product purchased for commercial purposes, the exclusive remedy is provided by the UCC, including its statute of limitations." *Neibarger*, 439 Mich. at 527–28, 486 N.W.2d 612. "Having decided that the UCC and the economic loss doctrine reflect the proper approach for resolution of defective product claims in the commercial arena," the Court then turned to application of that doctrine under the facts of the cases before it. *Id.* at 529, 486 N.W.2d 612.

The *Neibarger* plaintiffs were owners and operators of dairy farms who had installed new milking systems. After the systems had been in place for some time, plaintiffs' cattle became ill and died or had to be sold for beef because of their unproductivity or unsuitability as milking animals. Plaintiffs alleged the milking systems were defectively designed and installed by defendants and sought to recover lost profits and consequential damages flowing from the alleged defects. In holding that plaintiffs' alleged damages fell squarely under the UCC and the economic loss doctrine, the Court stated that when characterizing injuries as economic (versus non-economic loss), "[t]he proper approach requires consideration of the underlying policies of tort and contract law as well as the nature of the damages." *Id.* at 531, 486 N.W.2d 612.

In *Detroit Board of Education v. Celotex Corp.*, 196 Mich.App. 694, 493 N.W.2d 513 (1992), a panel of the Michigan Court of Appeals discussed such policy considerations in a case factually similar to the present action. Defendant argues that the Michigan Court of Appeals' discussion of *Neibarger* and the economic loss doctrine is dictum and has no precedential value. This Court disagrees.[5] Noting that the relevance of the *Neibarger* decision was raised at oral argument, the court of appeals stated that it was "obliged" to address the issue before reaching the issues stipulated for review. *Celotex*, 196 Mich.App. at 701 n. 2, 493 N.W.2d 513. The court then discussed the economic loss doctrine, as set forth in *Neibarger*, at length, ending its discussion with the following: "We conclude, on the facts of this case, that plaintiffs' proper remedy lies in tort, not con-

---

menced within four years of tender of delivery of the goods, regardless of the time of discovery of the breach. *See Neibarger v. Universal Cooperatives, Inc.*, 439 Mich. 512, 520, 486 N.W.2d 612 (1992). Thus, if plaintiff had brought this action under the UCC, and if all of the ACFM was purchased more than four years before this action was commenced, the UCC claims would be barred. *See Detroit Board of Education v. Celotex Corp.*, 196 Mich.App. 694, 702, 493 N.W.2d 513 (1992) (copy attached).

5. This Court also finds unpersuasive defendant's suggestion that the *Celotex* decision conflicts with *Sullivan Indus., Inc. v. Double Seal Glass Co.*, 192 Mich.App. 333, 480 N.W.2d 623 (1991). The issues and facts in the *Celotex* and *Sullivan* cases are distinguishable and the holdings in each are easily reconciled.

tract or the UCC." *Id.* at 705, 493 N.W.2d 513. Had the court concluded that plaintiff's tort claims were barred by the economic loss doctrine, clearly it would have been unnecessary to proceed with a discussion of the issues stipulated for review. This Court believes the *Celotex* court's discussion of the economic loss doctrine and its conclusion regarding the applicability of the doctrine to the facts before it was necessary to the formulation of the decision and directly related to the issues presented. The Court finds the decision relevant to the case *sub judice*, and shall give the decision due regard. *See Sours v. General Motors Corp.,* 717 F.2d 1511, 1513–14 (6th Cir.1983).[6]

In *Celotex*, plaintiff (the Detroit Board of Education), filed suit against defendants (asbestos manufacturers, distributors and installers of a variety of asbestos products used in plaintiff's school buildings), seeking to recover asbestos abatement costs. The court of appeals recognized that in view of *Neibarger*, if the damages plaintiff sought were for economic losses, plaintiff's exclusive remedy would be under the UCC with its four-year period of limitations. *Celotex,* 196 Mich.App. 694, 701–02, 493 N.W.2d 513. The court nevertheless concluded that the economic loss doctrine did not bar plaintiff's tort claims.[7] This Court finds the following quotation from *Celotex* to be well reasoned and persuasive:

> According to *Neibarger*, tort remedies for defective products are premised on a policy of allocating the risk of unsafe products to manufacturers and sellers in order to encourage the design of safer products, and this policy is not served where the parties to a commercial transaction may bargain for the terms and specifications of a sale and the only losses are economic. *Id.* [439 Mich. at] at

523 [486 N.W.2d 512]. Stripped to the essence, then, policy holds that "defects of suitability and quality are redressed through contract actions and safety hazards through tort actions." *Northridge Co. v. W.R. Grace & Co.,* 162 Wis2d 918, 934; 471 NW2d 179, 185 (1991).

> In the present case, plaintiffs do not allege that defendants' products were inferior in quality or did not work for their intended purpose. They do not claim any injury to the product themselves. Rather, they claim that defendants' products are safety hazards that have created a potential health threat and caused them to suffer damages in abating the hazard. We also observe that it is highly unlikely that the parties could have anticipated and bargained over the hazards of asbestos at the time the products were sold, which was apparently years before the risks of the material were known. In short, the risk involved here is not the type that is allocated to a party through negotiation. We conclude, on the facts of this case, that plaintiffs' proper remedy lies in tort, not in contract or the UCC.

*Id.* 196 Mich.App. at 704–05, 493 N.W.2d 513 (footnote omitted).

Similarly, in *80 South Eighth St. Ltd. Partnership v. Carey–Canada, Inc.,* 486 N.W.2d 393 (Minn.1992), the Minnesota Supreme Court held that the economic loss doctrine did not bar the owner of a commercial building with asbestos-containing fireproofing from suing the manufacturer under various tort theories for the costs of maintenance, removal and replacement of the fireproofing. *Id.* at 399. The Court considered the issue in view of the economic loss doctrine as set forth in *Hapka v.*

---

**6.** "'A federal court sitting in diversity must apply the law of the state's highest court. If the highest court has not spoken, the federal court must ascertain from all available data what the state law is and apply it. If the state appellate court announces a principle and relies on it, that is a datum not to be disregarded by the federal court unless it is convinced by persuasive data that the highest court of the state would decide otherwise.'" *Sours,* 717 F.2d at

1514 (quoting *Clutter v. Johns–Manville Sales Corp.,* 646 F.2d 1151, 1153 (6th Cir.1981)).

**7.** In reaching its decision, the court found it noteworthy that all jurisdictions that have considered the question have declined to apply the doctrine to cases concerning asbestos contamination of buildings. *See Celotex,* 196 Mich.App. at 703–04, 493 N.W.2d 513, and cases cited

*Paquin Farms,* 458 N.W.2d 683 (Minn. 1990). Notably, the Michigan Supreme Court in *Neibarger* quoted *Hapka* with approval. *Neibarger,* 439 Mich. at 531–32, 486 N.W.2d 612.

In view of *Neibarger,* in ruling on defendant's Rule 12(b)(6) motion, this Court must look to the four corners of plaintiff's complaint, accept all factual allegations contained therein as true, and decide whether the complaint should be dismissed because it appears beyond doubt that plaintiff seeks only economic losses. Plaintiff seeks recovery for "analysis, removal, and replacement of the asbestos-containing building materials and other asbestos contaminated property...." (Complaint ¶ 13) Nothing in the complaint suggests that these damages were caused by the failure of the ACFM to perform as expected, *e.g.,* plaintiff does not aver that the ACFM failed to perform as a fire retardant. The claim is that the ACFM are releasing asbestos fibers into the air at Roseville Plaza, and that such fibers are highly dangerous to humans. (Complaint ¶¶ 7, 12)

This Court agrees with the conclusions reached in *Celotex* and *80 South Eighth,* and believes that the Michigan Supreme Court would conclude that the economic loss doctrine does not bar plaintiff's tort claims under the facts of this case. By characterizing plaintiff's damages as non-economic, the tort policy of allocating risks associated with dangerous products to the manufacturer and seller (who are thereby encouraged to design and produce safe products) will be served. Likewise, this Court believes that the injury plaintiff now seeks to redress was beyond the contemplation of the parties at the time the ACFM was purchased, and therefore, the risk involved here is not the type that is allocated to a party through negotiation. In sum, this Court believes that the underlying policies of tort and contract law as well as the nature of the damages sought in the present action dictate a finding that plaintiff

does not seek to recover economic losses as that term is defined in *Neibarger.* Therefore, defendant's motion to dismiss shall be denied.

### III. The Statute of Limitations

Defendant seeks summary judgment pursuant to Federal Rule of Civil Procedure 56 arguing that there exists no genuine issue of material fact that plaintiff's complaint is barred by the applicable statute of limitations. To avoid summary judgment, plaintiff must "go beyond the pleadings and ... by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In ruling on defendant's summary judgment motion, "'inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to" plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

"A statute of limitations defense is properly asserted in a motion for summary judgment to show that the defendant is entitled to judgment as a matter of law." *Admiralty Fund v. Jones,* 677 F.2d 1289, 1293 (9th Cir.1982). "[S]ummary judgment is appropriate only if (1) the statute of limitations has run, thereby barring plaintiff's claim as a matter of law, and (2) there exist no genuine issues of material fact regarding the time at which plaintiff's claim has accrued and the application of the statute to plaintiff's claim which may be resolved in plaintiff's favor." *Yorger v. Pittsburgh Corning Corp.,* 733 F.2d 1215, 1219 (7th Cir.1984).

■ This products liability action is governed by a three-year limitation period and the discovery rule applies. *See Celotex,* 196 Mich.App. at 705, 493 N.W.2d 513.[8]

---

therein. This Court also finds such cases to be persuasive authority.

8. Having concluded that plaintiff may pursue its claims outside the framework of the UCC, the Court finds it unnecessary to consider defen-

dant's alternative argument that the UCC's four-year limitation period applies. Likewise, in light of this Court's disposition of the statute of limitations issue, the Court need not address defendant's request for a separate trial on the limitations issue.

The dispute in this matter centers on when plaintiff's cause of action accrued.

A products liability claim accrues when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered an injury and a likely cause of the injury, regardless of whether the plaintiff is able to prove each element of the claim. *Moll v. Abbott Laboratories*, 192 MichApp 724; 482 NW2d 197 (1992).

*Id.* 196 Mich.App. at 706, 493 N.W.2d 513. Plaintiff filed suit on May 31, 1991. Thus, if there exists no genuine issue of material fact that, prior to May 31, 1988, plaintiff discovered or, should have discovered through the exercise of reasonable diligence, that Roseville Plaza was actually contaminated by ACFM, then defendant is entitled to summary judgment.

■ Defendant argues that there are several reasons why this Court must find that there exists no genuine issue of fact that plaintiff's cause of action accrued well before May 31, 1988. Defendant relies upon a March 28, 1984, letter from the Michigan Department of Public Health (the "MDOPH"); a January 11, 1988, memorandum from Richard Gershenson, a partner in the plaintiff-limited partnership, to the "File" regarding a "Project" at Roseville Plaza. The subject of the memorandum is "Material Abatement"; [9] testimony from Peter Burgum, plaintiff's former Director of Property Management; [10] and several other documents produced by plaintiff which pre-date May 31, 1988.[11]

The Court finds the 1984 MDOPH letter to be of particular significance. The letter conveyed the results of a March 16, 1984, investigation conducted by the MDOPH at Roseville Plaza (then known as the Old Korvette Building). At the time the investigation was undertaken the second floor of Roseville Plaza was being renovated. One of the workers involved in the renovation project filed a complaint with the MDOPH concerning "a potential for exposure to asbestos fibers while scraping insulation from I-beams" in the building. (3/28/84 MDOPH Letter) Richard Gershenson testified that he received the MDOPH letter shortly after the complaint was filed.[12] The letter states, in pertinent part:

Since none of the employees were engaged in the removal of insulation from I-beams on March 16, air in the breathing zone of an employee assigned to attaching metal studs to I-beams was sampled for airborne fibers. In addition, a sample of I-beam insulation was submitted to our laboratory for analysis. As can be seen from the enclosed data sheet, the

---

9. The memorandum summarizes a November 24, 1987, meeting between Richard Gershenson and "abatement contractors," and states, in part: "The following information was obtained at that meeting regarding the cost of hazardous material abatement at Roseville. There is approximately 480,000 s.f. of area that requires removal. This is comprised of 185,000 s.f. of deck area resulting from overspray of fireproofing material and 295,000 s.f. of beams and joists." (1/11/88 R. Gershenson Mem.) The memorandum goes on to summarize costs associated with the "material abatement." Plaintiff argues that nothing in the memorandum creates an inference that plaintiff knew or should have known of its claims. The Court disagrees and believes that the memorandum lends strong support to defendant's argument that plaintiff's cause of action accrued before May 31, 1988.

10. Burgum testified that prior to May 11, 1988, (when he walked through Roseville Plaza with a contractor who was conducting an environmental risk assessment) he knew Roseville Plaza contained asbestos and that it would expensive to remove it. (Burgum Dep. at 61–62)

11. The documents include a list of licensed asbestos contractors prepared by the Michigan Department of Public Health, Division of Occupational Health, date stamped "RECEIVED Sep 29 1987"; and a letter dated May 23, 1988, from the National Realty Committee (NRC) transmitting an article on "asbestos and buildings." (Def.Stat. of Lim.S.J.Ex. H and K, respectively) The NRC letter has a date of "5/25" written on it and underneath the date are a series of initials (RG, JG, BG, MW, DG) as well as the word "ABATEMENT." (*Id.* Ex. K)

12. (Richard Gershenson Dep. at 38–39) Joel Gershenson, plaintiff's Chief Executive Officer, testified that he was aware of the fact that Roseville Plaza contained asbestos because his brother (Richard Gershenson) told him about the MDOPH's investigation. When asked if he could recall when his brother told him of the investigation, Joel Gershenson replied "I believe it was 1984." (Joel Gershenson Dep. at 24)

employee's exposure to all types of fibers was within the asbestos fiber Maximum Allowable Concentration (MAC). The insulation analyzed 3 percent asbestos.

Although the asbestos content of the I-beam insulation is low, it is recommended that the insulation be wetted down during removal and sealed in labeled plastic bags for burial in a landfill. The employees assigned to the task should wear NIOSH approved toxic dust respirators. For additional information on safe handling procedures for asbestos, see the enclosed Rule 2206.

No violations of the Michigan Occupational Health Standards for General Industry were observed during our investigation.

(3/28/84 MDOPH Letter) The data sheet indicates the presence of airborne fibers in one of the two air samples analyzed. (3/28/84 MDOPH Letter, Enclosure–Data Sheet) The data sheet reported 0.24 asbestos fibers per cubic centimeter (fibr/cc) based on a sample described as "Installing metal studs on 2nd floor of old Korvette's building, James Meux." (*Id.*) The Maximum Allowable Concentration was "*2 fibr/cc* Ceiling Limit *5 fibr/cc.*" (*Id.*)

Plaintiff argues that its claims did not accrue in 1984 because the MDOPH letter stated that no violations of the Michigan Occupational Health Standards for General Industry were observed. It is plaintiff's position that its claims accrued when it received a June 2, 1988, Environmental Risk Assessment (ERA) prepared by Clayton Environmental Consultants, Inc. (the "Clayton ERA"); that until receipt of the

Clayton ERA, it had no knowledge of actual contamination at Roseville Plaza; and that the Clayton ERA made it realize it had a hazardous situation that needed abatement. Since the Clayton ERA was not issued until June 2, 1988, plaintiff argues this action (commenced on May 31, 1991) was timely filed.[13]

It follows from plaintiff's argument that the 1988 Clayton ERA contains information about the actual asbestos contamination of Roseville Plaza which the 1984 MDOPH letter does not. The Court has examined the two documents. Each discloses that the sprayed-on insulation in Roseville Plaza contains asbestos; that asbestos is potentially hazardous; and that safety precautions must be taken when removing the asbestos-containing materials. Thus, with respect to the presence of asbestos in Roseville Plaza and the dangers of asbestos, the 1988 Clayton ERA merely reiterated information conveyed to plaintiff in the 1984 MDOPH letter.

With regard to airborne asbestos, the MDOPH took two air samples in 1984, one of which disclosed the presence of airborne asbestos fibers in Roseville Plaza. Two of plaintiff's principals, Richard Gershenson and Joel Gershenson, testified they were aware of the MDOPH investigation in 1984. The Clayton ERA did not disclose that any air samples were taken, but did recommend that future testing include air sampling.[14] To prevent the "potential health hazard" of airborne asbestos fibers, Clayton recommended that plaintiff "consider removing, encapsulating, or enclosing all exposed asbestos-containing materials." (6/2/88

---

**13.** (10/29/92 Hearing Transcript at 30–31) Clayton was authorized by plaintiff to conduct a survey of friable asbestos-containing materials at Roseville Plaza. There are three versions of the Clayton ERA in the record—a June 2, 1988 report, a June 8, 1988 "revised copy," and a July 21, 1988 "corrected copy." All of the reports are dated after the critical date for limitations purposes—May 31, 1988. Clayton defined friable material as "one which, when dry, can be crumbled, pulverized or reduced to powder by hand pressure." (Clayton ERA at 1.0) Plaintiff also points out that friable asbestos material is defined in the Code of Federal Regulations as "any material containing more than 1 percent asbestos as determined using the method specified in

appendix A, subpart F, 40 CFR part 763, section 1, Polarized Light Microscopy, that, when dry, cannot be crumbled, pulverized or reduced to powder by hand pressure." 40 C.F.R. § 61.141 (1992).

**14.** In the "RECOMMENDATIONS" portion of the Clayton ERA, the following comments appear: "*Future Testing* Air sampling should be conducted in areas with the greatest likelihood of asbestos fibers becoming airborne ... If corrective action is necessary, air sampling will help establish priorities for such action...." (6/2/88 Clayton ERA at 2.2.1)

Clayton ERA at 2.2.2) Alternatively, Clayton recommended that plaintiff take steps "to prevent the potential release of fibers from damaged asbestos-containing materials" by examining and repairing the materials regularly. (*Id.*) Clayton's recommendations were clearly precautionary and did not advise plaintiff that Roseville Plaza was actually contaminated with airborne asbestos fibers. Clayton discussed the *potential* for such contamination, and suggested methods of avoiding the hazard.

The Court recognizes that the Clayton ERA did report the presence of loose fireproofing debris in several areas of Roseville Plaza, and that the MDOPH letter did not report such information.[15] The Court does not believe that the information disclosed in the Clayton ERA was notably different than the content of the MDOPH letter. When the MDOPH conducted its investigation, the ACFM was being scraped from I-beams in Roseville Plaza. This process certainly caused the fireproofing material to become loose and fall to the floor. Consequently, the MDOPH advised plaintiff in 1984 to take precautionary measures when removing the asbestos-containing materials. In addition, the MDOPH letter disclosed the actual presence, albeit at a low level, of airborne asbestos fibers.

The Court finds unpersuasive plaintiff's argument that the MDOPH letter should not provide a basis for accrual of its cause of action because it reported that no violations of Michigan Occupational Health Standards for General Industry were observed. Plaintiff argues the MDOPH provided "assurances" that Roseville Plaza contained no unsafe conditions. This is not an accurate portrayal of the information conveyed. The MDOPH conducted a limited investigation of Roseville Plaza on March 16, 1984. It did not inspect the entire building. In so doing, the MDOPH reported it had not "observed" any violations during its investigation. For plaintiff

to suggest that the MDOPH was providing assurances that no unsafe conditions existed at Roseville Plaza *ad infinitum* is simply a mischaracterization of the extent of the investigation and the content of the information conveyed in the MDOPH letter. Furthermore, by arguing that its cause of action did not accrue because the MDOPH reported that it observed no violations on the day of its visit, plaintiff suggests that the cause of action in a property damage asbestos case does not accrue until it has been shown that violations of some governmental standard for safety exist. The Court finds such a position untenable.

First, nothing in the Clayton ERA reports the presence of asbestos (airborne, friable, or otherwise) at a level which exceeds limits established by a governmental entity, underlying the very premise of plaintiff's position. Second, to accept plaintiff's position would, in this Court's view, postpone accrual until a time of plaintiff's own choosing—precisely the type of conduct the *Moll* and *Celotex* courts cautioned should not control the question of when a cause of action accrues. (*See Moll v. Abbott Laboratories*, 192 Mich.App. 724, 734, 482 N.W.2d 197 (1992)) ("the accrual date of a cause of action should not be postponed until the potential litigant discovers the claim with the assistance of professionals"); *Celotex*, 196 Mich.App. at 708, 493 N.W.2d 513 (a plaintiff "cannot circumvent the statute [of limitations] by arguing that its claim did not accrue until a time of its own choosing").

The *Celotex* court rejected plaintiff's argument that its cause of action did not accrue until receipt of an air sampling survey which revealed the presence of airborne asbestos in seven of fifty-four samples. The court held that plaintiff's claims accrued when plaintiff had knowledge of the presence of asbestos in its building, general knowledge of the potential health hazards of friable asbestos, and what had

---

**15.** In the "RESULTS AND DISCUSSION" section, Clayton reported that the fireproofing was "generally in good condition" with the exception of two areas where loose fireproofing debris was observed on the top of ceiling tiles, and a mechanical room which had some loose fire-

proofing debris on the floor. Clayton recommended that "all areas of loose fireproofing debris in the plaza be cleaned up with a HEPA filter-equipped vacuum cleaner." (6/2/88 Clayton ERA at 4.0)

to be done to abate the hazard.[16] The *Celotex* court reasoned: "[T]he Board's claim that it lacked notice until the air sample results were obtained is unpersuasive. Perfect knowledge of the extent of an injury is not a prerequisite to the running of the statute." *Id.*

In the present action, plaintiff argues that its cause of action did not accrue until receipt of an environmental assessment, and attempts to distinguish this case from *Celotex*. The Court is not persuaded by plaintiff's arguments.[17] Plaintiff was advised by the MDOPH in 1984 that materials in its building contained asbestos. The MDOPH letter disclosed the presence of airborne asbestos fibers in the building, and made clear that exposure to asbestos could lead to health problems. Yet, plaintiff waited four years after receiving the MDOPH investigation to order a professional survey of the asbestos-containing materials in Roseville Plaza. What ultimately prompted plaintiff to obtain the environmental risk assessment in 1988 is in dispute; however, defendant has argued that plaintiff was motivated by conditions set forth in a loan agreement plaintiff entered into with Barclay's Bank PLC (Barclay's).[18] This suggests that if plaintiff had not been desirous of the Barclay's loan, it may not have obtained an environmental

assessment in 1988. The Court wonders at precisely what point plaintiff would argue its cause of action accrued had it not been prompted by Barclay's to "delve into the matter." (Pl. Second Supp.Resp.Br. at 5) The Court finds, however, that it is unnecessary for purposes of this decision, to decide precisely when plaintiff made its commitment to Barclay's or why plaintiff ultimately decided in the Spring of 1988 to order the environmental assessment.[19]

After considering all of the evidence presented by defendant, and viewing all inferences to be drawn from the underlying facts in a light most favorable to plaintiff, the Court believes that there exists no genuine issue of material fact that plaintiff's cause of action accrued before May 31, 1988, and that the evidence is such that no reasonable jury could find otherwise. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 284, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). This is so even accepting plaintiff's argument that it did not discover its cause of action until June 2, 1988; because, *under the circumstances of this case*, plaintiff *should have* discovered its claims through the exercise of reasonable diligence before May 31, 1988. Consequently, this Court shall grant defendant's motion for summary judgment as to plaintiff's

16. It is noteworthy that Richard Gershenson's January 11, 1988, memorandum contains specific details about what had to be done at Roseville Plaza with regard to "hazardous material abatement" on beams and joists in the building. (1/11/88 R. Gershenson's Mem.)

17. Plaintiff argues that the court of appeals placed significant emphasis on the characterization of asbestos as "friable," and that it did not know the ACFM in Roseville Plaza was friable until receipt of the Clayton ERA. The *Celotex* court's characterization of asbestos as "friable" did not, in this Court's view, carry with it the significance plaintiff now ascribes. And assuming *arguendo* it did, given the 1984 MDOPH letter which disclosed Roseville Plaza contained insulation that tested 3 percent asbestos; the fact that the tests were conducted while the insulation was being scraped off I-beams in the building; and the May 23, 1988, NRC letter and attached article discussing "friable" asbestos, this Court is convinced that if plaintiff did not know the ACFM in its building was "friable" before May 31, 1988, it certainly should have through the exercise of reasonable diligence.

18. Defendant contends that plaintiff decided and committed to remove all of the ACFM before it obtained the environmental assessment as a condition precedent to receipt of a multimillion dollar improvement loan from Barclay's. Removal of all asbestos from Roseville Plaza was a condition of the Barclay's loan. (9/16/88 Disbursing Agreement at 3) The earliest date referred to in the Agreement in connection with the asbestos removal requirement is July 26, 1988. (*Id.* at 1, 3) Plaintiff argues that the Clayton ERA prompted it to begin its abatement program; that the decision to remove the asbestos was based upon a concern for the safety of the building's occupants; and that the decision was independent of any assurances given to Barclay's.

19. The Court does, however, find remarkable the close proximity in time between the loan and plaintiff's decision to begin its abatement program.

negligence, misrepresentation, implied warranty of merchantability and implied warranty of fitness claims because such claims are barred by the applicable limitations period.

## IV.  Nuisance

■ Plaintiff's nuisance claim is also barred by the expiration of the statute of limitations.  In *Celotex,* the Michigan Court of Appeals held "that manufacturers, sellers, or installers of defective products may not be held liable on a nuisance theory for injuries caused by the defect." *Celotex,* 196 Mich.App. at 710, 493 N.W.2d 513.  The court of appeals stated:

> The bulk of the Board's claims are barred by the running of the statute of limitations.  The Board's nuisance claim survived in the trial court, however, on the basis that the asbestos products were a continuing nuisance which, despite the Board's knowledge of its claim, was not barred by the statute of limitation.  Statutes of limitation are founded in public needs and public policy, *In re Straight's Estate,* 329 Mich 319, 325; 45 NW2d 300 (1951), and the public would not be served by neutralizing the limitation period by labeling a products liability claim one for nuisance.

*Id.* 196 Mich.App. at 710–11, 493 N.W.2d 513.  This Court agrees with this reasoning.

■ This Court also agrees with the second rationale set forth by the *Celotex* court in addressing the viability of plaintiff's nuisance claim.  The court stated that "[w]hile control over a nuisance at the time of injury may not always be required in a nuisance action, on the facts of this case we hold that it is." *Id.* at 712, 493 N.W.2d

513.  The facts of this case compel a similar result.  This case involves a commercial transaction where defendant gave up ownership and control of its product to plaintiff at the time of the sale.  In so doing, plaintiff became the exclusive owner and possessor of the product, and defendant thereafter lacked any legal right to abate whatever hazard its product may have posed.  As in *Celotex,* under these circumstances plaintiff's "proper remedies, were they not barred by the running of the limitation period, are products liability actions for negligence or breach of warranty." *Id.* at 712, 493 N.W.2d 513.  Consequently, the Court shall grant defendant's summary judgment motion as to plaintiff's nuisance claim.[20]

## V.  Restitution

Plaintiff labels Count X "Restitution" and avers that defendant had a duty to abate the ACFM;  that defendant refused to perform its duty;  that plaintiff performed defendant's duty;  and that plaintiff is entitled to restitutionary relief under § 115 of the Restatement of Restitution. RESTATEMENT OF RESTITUTION § 115 (1937).  Defendant characterizes Count X as an "equitable" restitution claim and argues that plaintiff cannot obtain equitable relief because it has allowed its legal theories to become time-barred by operation of the statute of limitations.  The *Celotex* decision held that an *equitable* restitution claim could not be maintained "[w]here a party has let his legal theories become time-barred by operation of the statute of limitations...." *Celotex,* 196 Mich.App. 713, 493 N.W.2d 513.  Thus, viewed as a claim for equitable restitution, this Court

**20.** This Court previously denied defendant's Rule 12(b)(6) motion with regard to plaintiff's nuisance claim.  In its second supplemental brief (filed after issuance of the *Celotex* decision) defendant argues, *inter alia,* that the nuisance claim should be dismissed in view of *Celotex,* and has offered to submit a renewed motion, if necessary.  Plaintiff responded acknowledging that the *Celotex* decision may be viewed as providing a basis for dismissing its nuisance claim, but maintaining its right to pursue the claim.  This Court believes defendant's earlier motion to dismiss the nuisance claim should have been granted, and finds it unnecessary for defendant to renew such motion under the unique circumstances of this case. *See United States v. Kentucky Utilities Co.,* 124 F.R.D. 146, 149–50 n. 1 (E.D.Ky.1989), *rev'd on other grounds,* 927 F.2d 252 (6th Cir.1991) (federal district courts have the power to modify or vacate an order previously entered in the same case by any judge to whom it was assigned and are not precluded from such action by law of the case principles).

believes summary judgment in defendant's favor should be granted as to Count X.

Plaintiff, however, maintains that Count X is a claim at law (and not in equity) relying on § 4(f) of the Restatement.[21] The Restatement is not legal authority. Neither party has presented, nor has the Court located a Michigan Supreme Court case expressly adopting § 4(f) or § 115. Thus, the question whether the Michigan Supreme Court would recognize these provisions is an open one, and this Court must resolve the question as it believes the Michigan Supreme Court would. *See Sours v. General Motors Corp.*, 717 F.2d 1511, 1513–14 (6th Cir.1983).

With regard to § 4(f), the Court notes that, without citation to that section, the Michigan Supreme Court has stated: "The phrase 'unjust enrichment' is used in law to characterize the result or effect of a failure to make restitution of or for property or benefits received under such circumstances as to give rise to a legal or equitable obligation to account therefor." *Buell v. Orion State Bank*, 327 Mich. 43, 56, 41 N.W.2d 472 (1950). And in *Brandon Twp. v. Jerome Builders, Inc.*, 80 Mich.App. 180, 263 N.W.2d 326 (1977), the Michigan Court of Appeals expressly recognized § 115, known as the "emergency assistance doctrine".[22] The court held that the Township

had stated a claim for restitutionary relief where it had pled abatement of a public nuisance created by defendants' dam under a quasi-contract/unjust enrichment theory premised upon § 115. *Brandon Twp.*, 80 Mich.App. at 183, 263 N.W.2d 326.[23]

■ A review of decisions rendered by the Michigan Supreme Court reveals many cases wherein the Court relied upon various provisions of the Restatement of Restitution in formulating its common law. However, the Court has not located a single case where the Michigan Supreme Court has cited and rejected a provision of the Restatement of Restitution. Given the Michigan Supreme Court's pattern of reliance on the Restatement of Restitution in fashioning its common law, and in light of the aforementioned decision, this Court concludes that the Michigan Supreme Court would accept both § 4(f) and § 115 as an accurate statement of the common law of restitution. The issue remaining is whether this is an appropriate case for application of these Restatement provisions.

■ Defendant contends it is entitled to dismissal of Count X under *Brandon Twp.* and § 106 of the Restatement because restitutionary relief under § 115 is only avail-

---

**21.** Section 4(f) of the Restatement of Restitution provides:

§ 4. REMEDIES.

In situations in which a person is entitled to restitution, he is entitled, in an appropriate case, to one or more of the following remedies:

. . . .

(f) a judgment at law or decree in equity for the payment of money, directly or by way of set-off or counterclaim.

**22.** Section 115 of the Restatement of Restitution provides:

§ 115. PERFORMANCE OF ANOTHER'S DUTY TO THE PUBLIC.

A person who has performed the duty of another by supplying things or services, although acting without the other's knowledge or consent, is entitled to restitution from the other if

(a) he acted unofficiously and with intent to charge therefor, and

(b) the things or services supplied were immediately necessary to satisfy the requirements of public decency, health, or safety.

**23.** In deciding whether the Michigan Supreme Court would allow plaintiff to recover under § 115, relevant decisions from "other courts of the State" must be given "proper regard." *Commissioner v. Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967). The parties have brought to this Court's attention two Michigan circuit court decisions which, relying on *Brandon Twp.*, found that relief may be available under § 115 where plaintiffs sought to recover asbestos abatement costs incurred in connection with public school buildings. *See Warren Consolidated Schools v. W.R. Grace & Co.*, No. 86–1190–NZ, slip op. at 5–6 (Macomb Co. Cir.Ct. Mar. 20, 1989); *Board of Education of the School District of Detroit v. Celotex Corp.*, Nos. 84–429634–NP, 85–527481–NP, 85–523463–NZ, slip op. at 48–52 (Wayne Co.Cir.Ct. Feb. 1, 1988), *aff'd in part and rev'd in part on other grounds sub nom. Detroit Board of Education v. Celotex Corp.*, 196 Mich.App. 694, 493 N.W.2d 513 (1992).

able where a plaintiff has performed without any obligation to do so on its own behalf.[24] Defendant argues that the Barclay's loan was conditioned upon plaintiff's agreement to remove the ACFM and, therefore, plaintiff is not entitled to relief under § 115. In its earlier Rule 12(b)(6) motion, defendant made a similar argument relying on a different factual premise—plaintiff's duty to protect its employees and/or tenants from the dangers of asbestos. In this Court's view, because plaintiff had a duty to make Roseville Plaza safe, plaintiff cannot recover under § 115, and this result may be reached without reference to § 106.[25]

Chapter 5 of the Restatement, entitled: "BENEFITS VOLUNTARILY CONFERRED WITHOUT MISTAKE, COERCION, OR REQUEST," clearly does not govern situations where a benefit is conferred *with* coercion. RESTATEMENT OF RESTITUTION, Chap. 5 at p. 461. Section 115 is contained in Chapter 5, and therefore, a person is not entitled to relief under § 115 where such person confers a benefit "with coercion." This is not to say that a person who voluntarily confers a benefit upon another "with coercion" is never entitled to restitutionary relief. In fact, Chapter 3, entitled "COERCION" expressly provides for restitutionary relief as a result of a benefit conferred "with coercion." One situation where a benefit is conferred "with coercion" is where "a payment is made ...

in the performance of a legal duty...." *Id.* at p. 288.

The circumstances stated in Chapter 3 are present in this case. *See Riddle v. McLouth Steel Products Corp.,* 440 Mich. 85, 90, 485 N.W.2d 676 (1992) ("It is well settled in Michigan that a premises owner must maintain his or her property in a reasonably safe condition and has a duty to exercise due care to protect invitees from conditions that might result in injury."). Plaintiff has a common law duty to maintain Roseville Plaza in a reasonably safe condition. In performing that duty, plaintiff avers that it has and will continue to incur expenses in carrying out its asbestos abatement program. Thus, even if this Court were to conclude that in incurring such expenses plaintiff was performing *defendant's* duty (a conclusion this Court has not reached),[26] the payment of such expenses was made "with coercion," as that term is defined in the Restatement, and therefore, relief under § 115 is not available.[27]

In addition, plaintiff is not entitled to relief under § 115 because it did not act "unofficiously" when it undertook its asbestos abatement program. An individual may be entitled to relief under § 115 if "he acted unofficiously" in conferring a benefit upon another. RESTATEMENT OF RESTITUTION § 115(a). "Officiousness means interference in the affairs of others not justified by the circumstances under

---

**24.** Section § 106 of the Restatement of Restitution provides:

§ 106. INCIDENTAL BENEFIT TO ANOTHER FROM PERFORMANCE OF ONE'S DUTY OR PROTECTION OF ONE'S THINGS.

A person who, incidentally to the performance of his own duty or to the protection or the improvement of his own things, has conferred a benefit upon another, is not thereby entitled to contribution.

**25.** The Court recognizes that it previously rejected defendant's motion to dismiss the restitution claim. However, this Court is now persuaded that such claim should be dismissed. *See United States v. Kentucky Utilities Co.,* 124 F.R.D. 146, 149–50 n. 1 (E.D.Ky.1989).

**26.** A strong argument could be made for the proposition that relief under § 115 is not avail-

able because defendant had no duty to remove the ACFM from Roseville Plaza. *See Board of Education of Chicago v. A, C AND S, Inc.,* 131 Ill.2d 428, 137 Ill.Dec. 635, 651–53, 546 N.E.2d 580, 596–598 (1989). As previously mentioned, when defendant sold the ACFM, it gave up ownership and control of its product to plaintiff and thereafter lacked any legal right to abate whatever hazard such product may have posed.

**27.** In view of this conclusion, the Court need not address defendant's argument that § 115 does not apply under the facts of this case because plaintiff had a contractual duty to remove the ACFM. Plaintiff contends its decision to remove the ACFM was motivated by health concerns, while acknowledging that it was contractually committed to remove the ACFM as a condition for obtaining the Barclay's loan.

which the interference takes place." [28]   It follows that "unofficiousness" means interference in the affairs of others that is justified under the circumstances.  This is simply not a case where it can be said that plaintiff interfered in defendant's affairs in undertaking the asbestos abatement program at Roseville Plaza.  Plaintiff, not defendant, owns and is responsible for maintaining Roseville Plaza.

In sum, restitutionary relief under § 115 is not available to plaintiff under the facts of this case, and defendant's motion for summary judgment shall be granted as to Count X.[29]

## VI.   Civil Conspiracy

Count VIII is a common law civil conspiracy claim.  Under Michigan law,

A conspiracy is a combination of two or more persons, by some concerted action, to accomplish criminal or unlawful purpose, or to accomplish a purpose not unlawful by criminal or unlawful means. *Veriden v. McLeod*, 180 Mich. 182 [146 N.W. 619].  In addition, at the core of an actionable civil conspiracy is a question of damages.  This facet of the law of conspiracy is accurately summed up in the case of *Roche v. Blair*, 305 Mich. 608, 613, 614 [9 N.W.2d 861]:

"The law is well established that in a civil action for damages resulting from wrongful acts alleged to have been committed in pursuance of a conspiracy, the gist or gravamen of the action is not the conspiracy but is the wrongful acts causing the damages.  The conspiracy standing alone without the commission of acts causing damage would not be actionable.  The cause of action does not result from the conspiracy but from the acts done."

*Fenestra Inc. v. Gulf American Land Corp.*, 377 Mich. 565, 593–94, 141 N.W.2d 36 (1966).

The Court has determined that defendant is entitled to summary judgment on all other substantive counts.  Thus, plaintiff's conspiracy allegations, which are not attached to allegations of a substantive wrong, are not actionable and Count VIII must be dismissed.

## VII.   Conclusion

Defendant's motion to dismiss based upon the economic loss doctrine shall be denied.  Defendant's motion for summary judgment based upon expiration of the statute of limitations and motion for summary judgment of plaintiff's restitution claim shall be granted and plaintiff's complaint (which contains the following remaining claims:  negligence (Count III), misrepresentation (Count IV), implied warranty of merchantability (Count VI), implied warranty of fitness (Count VII), civil conspiracy (Count VIII), nuisance (Count IX), and restitution (Count X)) shall be dismissed in its entirety.  An Order consistent with this Opinion shall issue forthwith.

**28.**  RESTATEMENT OF RESTITUTION § 2 cmt. a.  Situations where restitutionary relief may be viewed as having been "unofficiously" conferred are described in Comment b following § 115. Restitution may lie:  for burial of the dead against a spouse or parent having a duty to care for the body; for removal of an obstruction from or repairs made upon a public road which has become imminently dangerous to the public traveling on the road against the town or person whose duty it is to care for the road; for the care of a person who is dangerously insane or afflicted with a contagious disease against a person having a duty to care for such person; or for abatement of a serious public nuisance such as a dead whale stranded on the shore close to a town.  *Id.* § 115 cmt. b.  In each example, the person who may be entitled to

relief is deemed to be "privilege[d] to interfere." *Id.* cmt. a.

**29.**  This conclusion is limited to the facts of this case and, in this Court's view is not inconsistent with the *Brandon Twp.* decision.  *Brandon Twp.* held that the Township had stated a claim for relief under § 115 where it had pled abatement of a *public* nuisance created by defendants' dam.  The present facts are sufficiently distinguishable from those in *Brandon Twp.*  Likewise, the decisions in *Warren Consolidated Schools v. W.R. Grace & Co.*, and *Board of Education of Detroit v. Celotex Corp.*, may be distinguished.  The circuit court decisions were brought by public school boards and turned on the applicability of § 106 to § 115.  This Court expresses no view on the applicability of § 106 to a valid claim under § 115.

APPENDIX

DETROIT BOARD OF EDUCATION,
Plaintiff–Appellee, Cross–
Appellant,

v.

CELOTEX CORPORATION, Armstrong
World Industries, Asbestospray Appli-
cators, Fibreboard Corporation, Flint-
kote Company, National Gypsum Com-
pany, Owens–Corning Fiberglas, and
United States Mineral Products Com-
pany, Defendants–Appellees, Cross–
Appellants,

and

GAF Corporation, Raymark Industries In-
corporated, and Gage Company, Defen-
dants–Appellants, Cross–Appellees,

and

AC & S Incorporated, Atlas Turner Incor-
porated, Eagle Picher Industries, Gar-
lock Incorporated, Georgia Pacific Cor-
poration, Keene Corporation, Mechani-
cal Insulation, Owens Illinois, United
States Gypsum Company, and T & N
PLC, Defendants–Appellees,

and

W.R. Grace & Company, Defendant–
Appellant,

and

Basic Incorporated, Defendant,
Cross–Appellant,

and

Alexander Stafford, Brown Insulation Com-
pany, Certainteed Corporation, Com-
bustion Engineering, Coon Deviser
Company, H.K. Porter Incorporated,
Hollinger & Company Incorporated,
Kentile Floors Incorporated, Pfizer Ge-
netics Incorporated, Standard Asbestos
Manufacturing, and William Reichen-
bach Company, Defendants,

and

Product Liability Advisor, Amicus
Curiae (On Remand).

Docket No. 123187.

Court of Appeals of Michigan.

Submitted Aug. 11, 1992, at Lansing.

Decided Nov. 17, 1992, at 9:00 a.m.

Released for Publication Jan. 19, 1993.

Before MacKENZIE, P.J., and WAHLS
and SULLIVAN, JJ.

ON REMAND

WAHLS, Judge.

In this interlocutory appeal from the
Wayne Circuit Court, the plaintiff class
consists of several hundred public school
districts and private schools in Michigan.
Defendants are manufacturers, distribu-
tors, or installers of a variety of asbestos
products that were used in plaintiffs'
school buildings. Plaintiffs have brought
this action against defendants, alleging nu-
merous theories of liability. Defendants
moved for summary disposition against one
of the representative plaintiffs, the Board
of Education for the School District of De-
troit ("the board"), pursuant to MCR
2.116(C)(7), (8), and (10). The trial court
granted defendants' motion in part and de-
nied it in part. Several defendants sought
leave to appeal the trial court's subsequent
order that granted in part and denied in
part the parties' motions for reconsidera-
tion or clarification. This Court denied
leave, but the case was subsequently re-
manded to us by our Supreme Court "for
consideration as on leave granted." 433
Mich. 903, 447 N.W.2d 749 (1989). Numer-
ous cross appeals have been filed. The
facts before us center on the board's
claims, and issues on appeal have been
limited by stipulation to the board's (1)
nuisance claim, (2) concert of action claim,
and (3) alternative liability claim, and the
defendants' statute of limitations defense.
We affirm in part, reverse in part, and
remand for further proceedings.

I

Some background facts are neatly set
forth in the trial court's opinion:

Between 1973 and 1978, the United
States Environmental Protection Agency
(EPA) successively barred in buildings

the use of various forms of asbestos-containing insulating and construction material. In 1978 and 1979, the EPA developed a school asbestos program to inform school officials of the potential health hazards of exposure to friable asbestos products.[1] In conjunction with this program, booklets were published by the EPA explaining the nature of the problem, how school officials could identify friable asbestos materials in their buildings, and various forms of corrective action that could be taken. School officials were also requested to complete a survey which would assist the EPA in determining contamination levels and the extent of the problem across the country.

\* \* \* \* \* \*

[N]otice of the possible hazards of air borne [sic] asbestos fibers had reached plaintiff [the board] at least by February, 1979. At this time, plaintiff resolved to conduct a survey of its buildings to determine if any had asbestos products. Indeed by June 21, 1979, plaintiff was sent the EPA publications on the subject. In July, 1979, a survey of possible problem areas in 48 buildings was conducted. Asbestos containing materials were found in 19 of the buildings. In the letter to Detroit's Department of Health, dated August 20, 1979, from the State Bureau of Environmental and Occupational Health accompanying the report of the laboratory tests for the survey, plaintiff was advised to inspect those areas where asbestos had been found to determine whether there was any reason to believe that it might become airborne. The letter also indicated that the Bureau could test for the presence of airborne asbestos fibers. However, the letter closed by indicating that there was no recommendation for removal of the material *assuming* it could be enclosed or covered up to eliminate the hazard. By early September, 1979, plaintiff was in possession of the survey results.

On September 26, 1979, plaintiff made inquiries of Armstrong Cork [Company], a manufacturer of ceiling tile whose products had been used in one of plaintiff's buildings, to determine whether its products contained asbestos. Significantly, the letter indicates that plaintiff was aware of the EPA's recommendation that friable asbestos materials be removed.

As a result of an inspection done by plaintiff of the buildings found in the July, 1979 survey to have asbestos containing material in 19 buildings, it was recommended by one of plaintiff's employees, in a Progress Report dated October 5, 1979, that the asbestos material be removed. Less drastic measures were recommended to treat the problem in the other buildings. By October 11, 1979, plaintiff began to explore how best to implement these recommendations.

By November, 1979, plaintiff had done a cost estimate of carrying out the above noted recommendations. On November 19, 1979, it submitted to the EPA a funding proposal for the cost of asbestos abatement. The total cost was estimated at $490,000. Although plaintiff never received the funding that it had requested, the recommendations were ultimately carried out.

On January 17, 1983, a class action suit by schools across the country was filed in the United States District Court for the Eastern District of Pennsylvania. The board and the other plaintiffs in this case opted out of the federal action and filed their own class action in the Wayne Circuit Court on October 12, 1984. Plaintiffs' complaint alleged theories of strict liability, intentional tort, negligence and wanton misconduct, breach of express and implied warranties, fraud and misrepresentation, civil conspiracy, nuisance, concert of action, alternative liability, and restitution. Plaintiffs generally alleged that the presence of asbestos constituted a potential health hazard and that they had and would continue to expend money for asbestos detection and abatement. The trial court granted summary disposition to defendants of all plaintiffs' claims except those for nuisance and

---

1. "Friable" asbestos is asbestos that can be powdered or crushed by hand.

the counts grounded upon nuisance as a substantive tort, i.e., concert of action and alternative liability. Summary disposition was also denied with regard to plaintiffs' claim for restitution.

## II

Before discussing the four issues stipulated for review, we are obliged to address our Supreme Court's recent opinion in *Neibarger v. Universal Cooperatives, Inc.,* 439 Mich. 512, 486 N.W.2d 612 (1992).[2] According to *Neibarger,* where a commercial plaintiff seeks to recover only "economic loss" caused by a defective product bought for commercial purposes, the plaintiff's exclusive remedy is provided by the Uniform Commercial Code, M.C.L. § 440.1101 *et seq.;* M.S.A. § 19.1101 *et seq.* If the U.C.C. provides the exclusive remedy in the present case, then plaintiffs' tort claims would be barred, as likely would any contractual claims arising out of the sale of goods. Unlike the three-year statute of limitations provided by the Revised Judicature Act for products liability actions, M.C.L. § 600.5805(9); M.S.A. § 27A.5805(9), the U.C.C.'s four-year period of limitation does not excuse a purchaser's lack of knowledge of a defect and runs from the time of delivery. M.C.L. § 440.-2725(2); M.S.A. § 19.2725(2). Because it is likely that most, if not all, of the asbestos-containing materials were purchased by plaintiffs more than four years before their action was brought, their claims would probably be barred under the U.C.C.

The economic loss doctrine, simply stated, provides that " '[w]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only "economic" losses.' " This doctrine hinges on a distinction drawn between transactions involving the sale of goods for commercial purposes where economic expectations are protected by commercial and contract law, and those involving the sale of defective products to individual consumers who are injured in a manner which has traditionally been remedied by resort to the law of torts. [*Neibarger, supra,* pp. 520–521 [486 N.W.2d 612], quoting *Kershaw Co. Bd. of Ed. v. U.S. Gypsum Co.,* 302 S.C. 390, 393, 396 S.E.2d 369 (1990).]

An individual consumer's tort remedy for a defective product is not premised upon an agreement between the parties, but rather on policy considerations and duties imposed by law that allocate the risk of damage caused by an unsafe product to the manufacturer and seller. On the other hand, in a commercial transaction the parties have the ability to bargain for the terms of sale, including warranties, disclaimers, and limitation of remedies. "Where a product proves to be faulty after the parties have contracted for sale and the only losses are economic, the policy considerations supporting products liability in tort fail to serve the purpose of encouraging the design and production of safer products." *Neibarger, supra,* 439 Mich. p. 523, 486 N.W.2d 612. Unlike most jurisdictions, Michigan now seems to apply the economic loss doctrine in a manner that bars an action in tort even if damages to other property are caused by the defective product. See *Neibarger, supra* (Levin, J., dissenting).

Assuming that plaintiffs are commercial entities that purchased defendants' goods in transactions that involved bargaining between buyers and sellers, at first blush their complaint appears to seek damages only for "economic losses" arising out of the sale of defective products. Plaintiffs' main claim for damages concerns the costs they have incurred in asbestos abatement. Plaintiffs have not alleged any personal injury, but only "potential" personal injury. Even if plaintiffs had expressly alleged that defendants' products had caused damage to "other property," such as the school buildings, *Neibarger* would not allow a remedy in tort. Nonetheless, we decline to apply the economic loss doctrine in the present case. We believe that the policy

**2.** The relevance of *Neibarger* to this case was raised during oral argument.

considerations that underlie the doctrine would not be served if we were to do so.

It has been said that asbestos cases are unique in the law. See *Chicago Bd. of Ed. v. A, C & S, Inc.*, 131 Ill.2d 428, 137 Ill.Dec. 635, 546 N.E.2d 580 (1989). The problem posed by asbestos cases is that asbestos products may contaminate a building, rendering it unfit for human occupation and subjecting the owner to abatement costs, without physically damaging the structure itself. Apparently, no jurisdiction has held that an asbestos tort claim is barred by the economic loss doctrine.[3] Rather, it appears that all jurisdictions that have considered the question have declined to apply the doctrine to cases concerning asbestos contamination of buildings. See, e.g., *City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975 (CA 4, 1987) (applying South Carolina law); *THS Northstar Associates v. W.R. Grace & Co.*, 767 F.Supp. 969 (D.Minn. 1991) (applying Minnesota law); *Hebron Public School Dist. v. U.S. Gypsum*, 690 F.Supp. 866 (D.N.D.1988) (applying North Dakota law); *Adams–Arapahoe School Dist. v. Celotex Corp.*, 637 F.Supp. 1207 (D.Colo.1986) (applying Colorado law); *Independence, Missouri School Dist. v. U.S. Gypsum Co.*, 750 S.W.2d 442 (Mo.App. 1988); *Chicago Bd. of Ed., supra.*

According to *Neibarger*, tort remedies for defective products are premised on a policy of allocating the risk of unsafe products to manufacturers and sellers in order to encourage the design of safer products, and this policy is not served where the parties to a commercial transaction may bargain for the terms and specifications of a sale and the only losses are economic. *Id.* 439 Mich. at 523, 486 N.W.2d 612. Essentially, then, policy holds that "defects of suitability and quality are redressed through contract actions and safety haz-

ards through tort actions." *Northridge Co. v. W.R. Grace & Co.*, 162 Wis.2d 918, 934, 471 N.W.2d 179 (1991).

In the present case, plaintiffs do not allege that defendants' products were inferior in quality or did not work for their intended purpose. They do not claim any injury to the products themselves. Rather, they claim that defendants' products are safety hazards that have created a potential health threat and caused them to suffer damages in abating the hazard. We also observe that it is highly unlikely that the parties could have anticipated and bargained over the hazards of asbestos at the time the products were sold, which was apparently years before the risks of the material were known.[4] In short, the risk involved here is not the type that is allocated to a party through negotiation. We conclude, on the facts of this case, that plaintiffs' proper remedy lies in tort, not in contract or the UCC.

### III

We now turn to the statute of limitations issue. The parties agree that a three-year limitation period applies to plaintiffs' claims, either the three-year period that applies to actions to recover damages for injury to a person or property, M.C.L. § 600.5805(8); M.S.A. § 27A.5805(8), or the three-year period for products liability actions, M.C.L. § 600.5805(9); M.S.A. § 27A.5805(9). The parties also assume that, if the applicable period had not already expired, the running of the period was tolled on January 17, 1983, the date the federal class action was filed, and that the "discovery rule" applies. The trial court held that the board's claim accrued on November 19, 1979, the date on which the board applied for federal funding to abate its asbestos problem. The trial court therefore dismissed the board's claims for

---

**3.** The only case we found in which an appellate court held that an asbestos claim was barred by the economic loss doctrine, *Banc One Building Management Corp. v. W.R. Grace & Co.—Conn*, unpublished decision of the Wisconsin Court of Appeals, decided August 14, 1990 (Docket No. 89–2330), was impliedly overruled by the Wisconsin Supreme Court's decision in *Northridge*

*Co. v. W.R. Grace & Co.*, 162 Wis.2d 918, 471 N.W.2d 179 (1991).

**4.** This statement should not be understood to imply that a tort claim may be stated by merely alleging that the parties did not actually negotiate the allocation of a particular risk alleged to be a safety hazard.

breach of implied warranty, negligence, wanton misconduct, and intentional tort.[5] The claims for nuisance and restitution were held timely, as were the claims for conspiracy, concert of action, and alternative liability to the extent that those claims were grounded on nuisance.

On appeal, the board argues that its claim did not accrue until January 30, 1980, the date on which it received the results of an air sampling survey it conducted. The survey showed the presence of airborne asbestos fibers in seven of fifty-four samples. According to the board, because only airborne asbestos fibers are hazardous, it cannot be held to have discovered that its property had been injured at an earlier date. The board concludes that two weeks of the limitation period remained when the federal class action was filed. We disagree.

A products liability claim accrues when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered an injury and a likely cause of the injury, regardless of whether the plaintiff is able to prove each element of the claim. *Moll v. Abbott Laboratories*, 192 Mich.App. 724, 482 N.W.2d 197 (1992). The discovery rule does not allow a claim to be held in abeyance indefinitely until a plaintiff obtains professional assistance to determine the existence of the claim. *Id.*, p. 734, 482 N.W.2d 197; *Grimm v. Ford Motor Co.*, 157 Mich.App. 633, 639, 403 N.W.2d 482 (1986).

The trial court, utilizing the formulation of the discovery rule set forth in *Bonney v. Upjohn Co.*, 129 Mich.App. 18, 342 N.W.2d 551 (1983),[6] held:

> [T]he Court finds there to be no issue of fact. In particular, the Court notes that it is undisputed that the general hazardous qualities of friable asbestos

were well known to plaintiff by [November 19, 1979]. Not only had the EPA barred the use of such materials in buildings in 1978 and instituted a school asbestos program to alert school districts of the dangers of friable asbestos materials, but plaintiff, by June, 1979, had actual knowledge of this. Thus by June, 1979, plaintiff had actual knowledge of the potential hazards of friable asbestos materials in a non [sic] industrial setting. While it may be there was some dispute over the *extent* of the hazard posed by such materials, that friable asbestos materials could and ultimately would cause a health hazard was not really disputed. Furthermore, in the summer of 1979, plaintiff undertook a preliminary investigation to determine whether its buildings had friable asbestos materials. The survey and subsequent analysis completed in September, 1979, showed the presence of such material in some of plaintiff's buildings. Thus, by September, 1979, not only was plaintiff in possession of a general knowledge of the hazards of friable asbestos, but also had actual knowledge that such materials were in its buildings. By October and November, 1979, plaintiff had determined what should be done to abate the hazard and the cost of abatement. Thus by November 19, 1979, the date plaintiff submitted a funding proposal for the estimated costs of abatement, plaintiff had knowledge of hazardous friable asbestos materials in its school buildings, which would require abatement both then and in the future.

The board argues that the record shows that the hazards of asbestos was an "open question" in 1979 and that it therefore cannot be charged with knowledge of its claim. The board's undisputed actions in 1979 render this argument disingenuous. For the

---

**5.** Defendants had previously been granted summary disposition with regard to the claims of strict liability, fraud or misrepresentation, any Uniform Commercial Code warranty claims, enterprise liability, and market share liability.

**6.** The *Bonney* formulation of the rule was rejected by the panel in *Moll, supra,* which held that the period begins to run when a plaintiff has

information that would lead a reasonable person to be aware, or after diligent inquiry to become aware, of an injury and its likely cause. *Moll, supra,* 192 Mich.App. p. 731, 482 N.W.2d 197. On the facts of this case, no different result would have been reached had the trial court applied *Moll.*

same reason, the board's claim that it lacked notice until the air sample results were obtained is unpersuasive. Perfect knowledge of the extent of an injury is not a prerequisite to the running of a statutory period of limitation. We also reject the board's argument, unsupported by relevant authority, that no claim arose until it suffered "compensable damages," that is, until the board expended money to abate the hazard. The board's claim arose in fact at the time the products were purchased or installed; the question is when the claim accrued for purposes of the statute of limitations. The board was aware of its "injury" and its likely cause in November 1979, *Moll, supra,* and the board cannot circumvent the statute by arguing that its claim did not accrue until a time of its own choosing. Finally, *Larson v. Johns–Manville Sales Corp.,* 427 Mich. 301, 399 N.W.2d 1 (1986), is inapplicable to the present claim for property damage, and we decline the board's invitation to apply it here.

The trial court properly held that the board's claim accrued no later than November 19, 1979. Therefore, defendants were correctly granted summary disposition with regard to the claims of negligence and wanton misconduct, breach of implied warranty, and intentional tort. MCR 2.116(C)(7).

### IV

The trial court erred, however, when it failed to grant defendants summary disposition of the board's claim of nuisance. The trial court believed that the existence of asbestos products in the board's buildings constituted a continuing nuisance for which the statute of limitations did not bar recovery, although recovery would be limited to the damages incurred within the limitation period. Defendants' liability was premised on their roles as "creators" of a nuisance. The present case is clearly a products liability action according to the statutory definition. See M.C.L. § 600.-2945; M.S.A. § 27A.2945. The question is whether it may also be characterized as a nuisance action, presumably for a private nuisance. In this issue of first impression, we hold that it may not.

We need not repeat the bewilderment expressed by the courts and secondary authorities concerning the exact boundaries of the tort of "nuisance." Suffice it to say that, despite attempts by appellate courts to rein in this creature, it, like the Hydra, has shown a remarkable resistance to such efforts. We therefore approach our task carefully, hopeful of an analysis worthy of Hercules, rather than his predecessors.

We note initially that all courts that have considered the question have rejected nuisance as a theory of recovery for asbestos contamination.[7] See *City of Manchester v. Nat'l Gypsum Co.,* 637 F.Supp. 646, 656 (D.R.I.1986); *Hooksett School Dist. v. W.R. Grace & Co.,* 617 F.Supp. 126, 133 (D.N.H.1984); *Johnson Co., Tenn. v. U.S. Gypsum Co.,* 580 F.Supp. 284, 294 (E.D.Tenn.1984). See also *Bloomington, Inc. v. Westinghouse Electric Corp.,* 891 F.2d 611, 614 (CA 7, 1989) (manufacturer of PCB not liable on nuisance theory).

The trial court's ruling stemmed from statements made in several opinions of this Court to the effect that nuisance liability may be imposed where (1) the defendant has created the nuisance, or (2) the defendant owned or controlled the property from which the nuisance arose, or (3) the defendant employed another to do work that he knew was likely to create a nuisance. *Radloff v. Michigan,* 116 Mich.App. 745, 758, 323 N.W.2d 541 (1982); *Mitchell v. Dep't. of Corrections,* 113 Mich.App. 739, 742, 318 N.W.2d 507 (1982). The board argued, and the trial court agreed, that because defendants "created" the asbestos products, they are liable for the creation of a nuisance. We disagree for two reasons.

---

7. During oral argument, counsel for the board directed our attention to *Hebron Public School Dist. v. U.S. Gypsum Co.,* 953 F.2d 398 (CA 8, 1992), a case in which a purchaser of asbestos products was allowed to bring a nuisance claim, among others, before a jury in a suit against a manufacturer. There is no indication in the case, however, that the legal viability of the nuisance claim was at issue.

First, and for the moment accepting the formulations of nuisance liability noted above, the trial court's ruling begs the question whether an asbestos product is a nuisance. Obviously, if an asbestos product is not a nuisance, defendants cannot be held liable on a nuisance theory irrespective of their roles in "creating" the products.

> The remoteness of any possibility that a product which has caused injury is legally classifiable as a nuisance for the injurious effects of which the manufacturer or seller may be held liable is apparent. For one thing, the idea of a wrongful use of property (as distinguished from an improper condition of property) is basic to the legal concept of nuisance. For another thing, the role of the "creator" of a nuisance, upon whom liability for nuisance-caused injury is imposed, is one to which manufacturers and sellers seem totally alien. [63 AmJur2d, Products Liability, § 593, pp 843–844.]

We agree and hold that manufacturers, sellers, or installers of defective products may not be held liable on a nuisance theory for injuries caused by the defect. To hold otherwise would significantly expand, with unpredictable consequences, the remedies already available to persons injured by products, and not merely asbestos products. This case presents an example of one such consequence. The bulk of the board's claims are barred by the statute of limitations. The board's nuisance claim survived in the trial court, however, on the basis that the asbestos products were a continuing nuisance that, despite the board's knowledge of its claim, was not barred by

the statute of limitations. Statutes of limitation are founded in public needs and public policy, *In re Straight's Estate*, 329 Mich. 319, 325, 45 N.W.2d 300 (1951), and the public would not be served by neutralizing the limitation period by labeling a products liability claim as a nuisance claim.

Second, we agree with defendants that the proposition that nuisance liability may be imposed on a party whose only act was to create the nuisance is overly broad. The law of nuisance is fraught with conditional rules and exceptions that turn on the facts of individual cases, and the cases almost universally concern the use or condition of property, not products.[8] Defendants argue that the board must show that defendants had control over the alleged nuisance in order for nuisance liability to be found and, because it is undisputed that the asbestos products left defendants' control years earlier when they were sold to the board and the other plaintiffs, defendants cannot be liable for nuisance.

One case in which a "product" negligence action was couched in terms of nuisance is *Beard v. Michigan*, 106 Mich.App. 121, 308 N.W.2d 185 (1981). In *Beard*, two boys removed a grenade from a Michigan National Guard firing range. The grenade subsequently exploded at a location away from the range, injuring the two. The trial court held that maintenance of the range was a nuisance per se, but that nuisance liability did not extend to injuries sustained from dangerous objects taken from the premises on which the nuisance was maintained. This Court held:

> In the instant case, defendant's liability is based on the maintenance of a dan-

---

**8.** For example, 58 Am.Jur.2d, Nuisances, § 123, p. 764, states in part:

> In lieu of a rule of general application, a functional test has been applied to determine whether the defendant "uses" property in a manner sufficient to subject him to liability for nuisance. A critical factor in this test is whether the defendant exercises control over the property that is the source of the nuisance. Thus, liability of a possessor of land is not based upon responsibility for the creation of the harmful condition, but upon the fact that he has exclusive control over the land and the things done upon it and should have

the responsibility of taking reasonable measures to remedy conditions on it that are a source of harm to others.

See also *Oxenrider v. Gvoic*, 340 Mich. 591, 66 N.W.2d 80 (1954); *Disappearing Lakes Ass'n v. Dep't. of Natural Resources*, 121 Mich.App. 61, 328 N.W.2d 570 (1982), aff'd *Ross v. Consumers Power Co.* (*On Rehearing*), 420 Mich. 567, 363 N.W.2d 641 (1984), and the cases therein. Compare this "functional test" to the law concerning the liability of former owners of property on which a nuisance is located, set forth at 58 Am.Jur.2d, Nuisances, § 126, pp. 767–768.

gerous condition resulting from unexploded grenades on defendant's premises. Liability cannot extend to where an object constituting part of the nuisance or the dangerous condition is removed from defendants' premises and thus out of their control. [*Id.* at 126, 308 N.W.2d 185.]

We find *Beard* persuasive. While control over a nuisance at the time of injury may not always be required in a nuisance action, on the facts of this case we hold that it is. This case concerns commercial transactions. Defendants gave up ownership and control of their products when the products were sold to plaintiffs. Defendants now lack the legal right to abate whatever hazards their products may pose; ownership and possession lie exclusively with plaintiffs. "If the defendants exercised no control over the instrumentality, then a remedy directed against them is of little use." *City of Manchester, supra* at 656. Plaintiffs' proper remedies, were they not barred by the running of the limitation period, are products liability actions for negligence or breach of warranty.

We conclude that the board has failed to state a claim of nuisance. MCR 2.116(C)(8). Accordingly, defendants should have been granted summary disposition on this theory.

### V

Defendants should also be granted summary disposition with regard to the board's claim for equitable restitution. We have affirmed the trial court's grant of summary disposition to defendants with regard to all but one of the board's substantive tort claims on the basis of the running of the limitation period. We have also concluded that the board failed to state a claim on its remaining theory of tort liability, nuisance. Where a party has let his legal theories become time-barred by operation of the statute of limitations, he cannot obtain relief in equity. *Lothian v. Detroit,* 414 Mich. 160, 169–170, 324 N.W.2d 9 (1982). Likewise, summary disposition should be granted to defendants with re-

gard to the board's claim for civil conspiracy because no legal or equitable claims remain in this case. *Roche v. Blair,* 305 Mich. 608, 9 N.W.2d 861 (1943).

### VI

The board on cross appeal also argues that the trial court committed several errors with respect to its rulings on the board's theory of alternative liability. Because there are no substantive legal or equitable claims remaining in this case, this issue is moot. The same is true with regard to the board's argument regarding market share liability and defendants' argument concerning concert of action.

Affirmed in part and reversed in part. Remanded for further proceedings involving the other plaintiffs and consistent with this opinion. Judgment to enter against the board only. We do not retain jurisdiction.