OXENRIDER *v.* GVOIC.

1. NUISANCE—DILAPIDATED BUILDINGS—ADJOINING OWNERS.

A building in a ruinous and dangerous condition, which collapses of its own weight and without any exterior force is a private nuisance to those owning property adjoining it.

2. MUNICIPAL CORPORATIONS — DILAPIDATED BUILDING — REMOVAL—CONTROL OF DEMOLITION.

Home-rule city was not acting as agent of owner of realty on which was located a dilapidated building that city building inspector condemned and ordered removed, from time that defendant was advised of unsafe condition of the building until it collapsed and damaged plaintiff's adjoining property, where city in such period not only condemned the building, but ordered that it be removed and the city council authorized a contract with a wrecking company to do so and defendant had been legally prevented from repairing the building or correcting its dangerous condition because of imminency of acquisition for public use and circumstances were such that defendant had right to assume building would be demolished by city (Detroit Ordinance 354–C).

3. ADJOINING LANDOWNERS—COLLAPSE OF BUILDING—CONTROL OF DEMOLITION—MUNICIPAL CORPORATIONS.

Defendant building owner may not be held liable for damages to adjoining property due to collapse of the building, where the control of the building, insofar as its demolition was concerned, was in the control of the city within which the property was located and whose building inspector had ordered it demolished, which order had been followed by city council's authorization to contract with a wrecking concern to do the work.

REFERENCES FOR POINTS IN HEADNOTES

[1] 39 Am Jur, Nuisance § 77.
[2] 9 Am Jur, Buildings § 40.
[3] 1 Am Jur, Adjoining Landowners § 14.

Appeal from Wayne; Toms (Robert M.), J.  Submitted June 10, 1954.  (Docket No. 41, Calendar No. 46,171.)  Decided October 4, 1954.  Rehearing denied November 29, 1954.

Case by Fred Oxenrider against Stella Gvoic for damage to property caused by collapse of her adjacent building.  Judgment for defendant.  Plaintiff appeals.  Affirmed.

*Samuel A. Mazzola* and *James Montante,* for plaintiff.

*Nicholas Salowich* and *Dee Edwards,* for defendant.

*Amicus Curiae* upon application for rehearing: Benjamin Glicker and Ann Olnick, by *Cornelia Groefsema.*

SHARPE, J.  This is an action by plaintiff to recover costs of repairs to his building, loss of rentals and other damages, caused by the collapse of defendant's adjacent brick building.  The facts have been stipulated and are well stated in the opinion of the trial court, from which we quote:

"In the latter part of 1951 plaintiff owned a 3-story brick commercial building at 302–304 Woodward avenue, and the defendant owned the adjacent building to the north, described as 308–310 Woodward avenue, consisting of a 3-story building immediately adjoining plaintiff's building and a 4-story building north of that.  On November 8, 1951, defendant's buildings, No 308–310, completely collapsed, causing some injury to plaintiff's building to the south, resulting in damage to the plaintiff.  The events between July 24, 1951, when defects in defendant's buildings were first noticed until the time of their collapse are set forth in a stipulation of facts filed by the parties, which stipulation was supplemented by some testimony on behalf of the plaintiff, from inspectors of the city building department.  The defendant quite properly offered no tes-

timony, inasmuch as the significant facts were either stipulated or not in controversy.

"The exact age of defendant's buildings was not disclosed, but it is obvious that they were very ancient in 1951. On July 24th Inspector Fitzpatrick, of the city building department, noticed that defendant's buildings contained serious structural defects and was [were?] dangerous. At that time the defendant herself was in Europe and she did not return until after the building had collapsed. During her absence her affairs were being managed by her sister, as her agent. The inspector found that the necessary repairs would exceed 50% of the assessed valuation of the buildings and therefore notified the defendant to dismantle and remove the entire building, after securing a permit therefor. The notice to defendant also directed her to appear at the building department office within 24 hours to show cause why she should not be subjected to a complaint in the ordinance division of the Recorder's Court for failure to maintain her property in a safe condition. A placard was tacked on the building designating it as condemned and dangerous. On July 26th, after a conference with the building department officials, the defendant had her contractor repair the bulging front wall of the building, but nothing further was done to comply with the notice from the building department. Sometime early in August (between the 2d and 7th) the order of the building department was modified after inspection by the head of the department and the department engineer, so that instead of complete demolition the defendant was notified to remove the portions of both buildings above the second floor and to reroof and properly repair the lower 2 floors. On August 7th some loose bricks from the defendant's building fell on the roof of an adjoining building on Woodbridge street owned by the city, and this apparently alarmed the building department, so that on August 9th a request was sent to the common council to have the department of public works take over the removal of the

upper floors of the building and to assess the costs against the property. On August 14th the council adopted a resolution authorizing and directing the department of public works to 'immediately dismantle and remove the third and fourth stories' of the defendant's building. The department of public works immediately erected a bridge over the sidewalk in front of defendant's building for the protection of pedestrians, and a month later on September 14th notified the defendant and her tenant to vacate the building until the wrecking operations were completed. On October 8th a building permit was issued through the city engineer's office to the city of Detroit—D.P.W., as 'owner' to undertake the demolition work. At this point the department of public works apparently began to doubt its ability to perform the wrecking job itself and therefore requested the common council to let the contract to a licensed wrecking concern, after asking for bids. On October 16th the council authorized a contract with Midwest Wrecking Company in the amount of $5,635 and directed that the contract price be charged against the property of the defendant. No contract was ever entered into with Midwest and it did nothing further after submitting its bid. The following day, October 17th, the council received a letter from defendant's attorney stating that his client was returning from Europe and upon her return would be able to have the work done at less cost than Midwest's bid, and requested that demolition be deferred. This petition by the defendant's attorney then started through the following channels: On October 23d it was referred to the building department for comment; on October 31st the building department recommended that the petition be granted; on November 1st the city clerk forwarded the petition to the department of public works; on November 2d the department of public works suggested that an opinion from the corporation counsel should be asked, with reference to possible liability to Midwest, if that company was not given the job. On November

8th the corporation counsel gave an opinion, that no contract having been signed there could be no liability to Midwest. At 6:30 on the same day (November 8th) defendant's buildings collapsed totally and completely."

Plaintiff's declaration contained the following:

"That the continuing nuisance consisted in the ownership and use of a building dilapidated, deteriorated and in imminent danger of collapse.

"That the defendants* knew or should have known of the imminent danger of collapse of the said building and that the condition of the said building constituted a private nuisance, which nuisance, if allowed to continue would cause severe damage to the adjoining property of the plaintiff.

"That the ruinous condition of the building could not have escaped the observation of the defendants and the nuisance created by the negligence of the defendants existed for a considerable period of time and continued up to and including November 8, 1951, at which time the said building collapsed, causing extensive damage, loss of rental, depreciation, attorney fees, architect, engineer and repairing expenses and other detailed expenses as set forth in the bill of particulars hereto attached and made a part hereof."

Defendant, Stella Gvoic, in addition to denying the above allegations in plaintiff's declaration, pleaded the following affirmative defenses:

"That at the time of the collapse of the building known as 308–310 Woodward avenue, Detroit, Michigan, and for some several weeks prior thereto—*i.e.* from and after August 14, 1951, defendant did not have control and/or possession of said building; but, on the contrary, the city of Detroit had assumed and was exercising control over said building and was in possession thereof and by reason of the exer-

---

* Proceedings against defendant's tenant, originally joined, were dismissed.—REPORTER.

cise of such control by the city of Detroit defendant was prevented, precluded and excluded from exercising any of her rights as owner thereof and, specifically, from repairing, restoring, demolishing or otherwise affecting the physical and structural condition of said building on said premises during said period.

"That from and after October 8, 1951, when the city of Detroit took out a building permit for the wrecking and repair of the building on said premises, and under and by reason of the provisions of the ordinances of the city of Detroit, particularly ordinance 354–C (being the building code) the city was wholly and solely responsible for the condition of said building. Reference is particularly prayed to section 1908, ordinance 354–C, as amended, and the following provision thereof:

" 'The wrecking company, or person who secures the permit for the razing of the structure, will be held responsible for the compliance with these regulations and other laws and ordinances covering this subject.' "

The cause came on for trial, and at its conclusion the court filed an opinion holding in effect that defendant was not negligent, and that she had been relieved of all responsibility by the action of the city of Detroit. Judgment was entered accordingly. Plaintiff appeals and urges that since defendant's dangerous building constituted a nuisance, and collapsed without exterior force, causing plaintiff to suffer damages, that defendant is liable for maintaining a nuisance, and that the action of the city of Detroit in failing to abate the nuisance did not relieve defendant of her liability for maintaining such nuisance. The principal issue in this case is whether defendant was so excluded from possession and control of her property by the action of the city as to relieve her from legal obligation to demolish in

whole or in part the dangerous structure. Upon this issue, the trial court stated in an opinion:

"And so, under the present circumstances does the law require that the defendant having been forewarned on July 24th, should have known that waiting until November 8th would prove disastrous? It must be conceded that the defendant was not entirely indifferent to the danger or to her duty to protect others. When she was notified on July 25th for the first time that her buildings were a public menace, she got in touch with the building department the following day and the day after that her contractor took steps to repair the bulging front wall. That was on July 27th. Less than 2 weeks later the building department had preempted the dismantling of the building by requesting the common council to direct the work to be done by the department of public works. Five days later the council authorized and directed the city department to proceed as requested. It seems to the court that at this early date the defendant had every right to presume that the city would proceed to do the job, which it had taken out of her hands. It had personnel and facilities in abundance for the purpose, and the mandate from the city council to proceed. Was it unreasonable for the defendant to presume that under these circumstances the repairs necessary to avert the danger would be accomplished speedily and expertly? The city had erected a bridge over the sidewalk, had taken out a building permit in its own name, had officially recognized the danger and had negotiated with a licensed wrecking company to the point of accepting its bid and authorizing a contract. There was everything to indicate to the defendant that the city meant business and that it was on the road to promptly taking care of the situation, without any help or advice from the defendant. What was the defendant expected to do up to this point? Did her duty require that she attempt to oust the city from its projected plan or protest against the city doing whatever the hazardous situation called for? The

plaintiff lays great stress on the letter of defendant's attorney to the common council, dated October 16th, in which he requested that in view of the size of the bid of the Midwest Wrecking Company for doing the work, that the defendant who was returning from Europe be permitted to have the demolition work done herself and at her own expense. This letter certainly does not indicate an indifference to her duty, nor an attempt to evade it, nor can the court see anything reprehensible in planning to have the work done at a minimum of expense. If this was an attempt to recapture control of the building from the city and to resume responsibility for the demolition, the fact remains that through no fault of the defendant the attempt was unsuccessful, because up to the very date of the collapse of the buildings [building?] the different city departments were consulting and conferring and communicating, without having even intimated to the defendant that the city was willing to relinquish its control and discontinue its efforts at demolition. Plaintiff insists that there was nothing to prevent the defendant going ahead independently, in the face of the building permit issued to the department of public works, and securing a building permit of her own to demolish the buildings. Even if this had been possible (which is not at all clear), how can it be said that the defendant's duty required that she take this strange and unusual step? The record discloses that if she had attempted to she would have been confronted by a resolution of the common council of 1947, which, having in mind the broad program of condemnation involved in the civic center development, had directed the department of buildings to refuse any building permit in that area for repairs involving more than $500. It would seem, therefore, that even if the defendant had attempted to secure an over-riding permit to displace the one issued to the department of public works, that it would have been refused for the reason indicated.

"It appears to the court, therefore, that under the facts and circumstances here disclosed, the defendant was not dilatory nor negligent in recognizing her duty to the plaintiff, and that she did everything which a reasonably prudent person, under the circumstances as they were known or appeared at the time, could have done to prevent injury. Had she known or had the city officials known that November 8th at 6:30 was to be the deadline and that the building would fall at that time, either the defendant or the city might have pursued a different course, but there was no possible way for the defendant to know that a building which had stood for over half a century would pick that particular date to collapse, even though there had been warning that collapse at some time was probable or even inevitable.

"Judgment of no cause for action may be entered."

It is a general principle that a building in a ruinous and dangerous condition which collapses of its own weight and without any exterior force is a private nuisance to those owning property adjoining it. See *Wilkinson* v. *Detroit Steel & Spring Works,* 73 Mich 405.

The record in this case shows that prior to July 25, 1951, defendant had substantially complied with all notices served on her by the building department regarding repairs to her building. We note that on August 14, 1951, the common council of the city of Detroit approved the following resolution:

"Resolved, that the department of public works be and it is hereby authorized and directed to immediately dismantle and remove the third and fourth story brick manufacturing building at 308–310 Woodward avenue, charging the cost of the work against the property."

On October 16, 1951, the common council passed the following resolution authorizing a contract with

Midwest Wrecking Company to proceed with wrecking and repairing defendant's building:

"Resolved, That the commissioner of public works be and he is hereby authorized and directed to enter into contract for the demolition and repair of buildings at 308–310 Woodward avenue, contract PW–1444, with the Midwest Wrecking Company in the amount of $5,635; and be it further

"Resolved, that the controller be and he is hereby authorized and directed to honor vouchers when presented. Said vouchers to cover the cost of advertising, inspection, and minor contingencies, as well as the contract costs, and to charge the same against account 143–2170–305; and be it further

"Resolved, that after the work has been completed and all costs determined, that the total cost for the work be charged against the property."

It also appears that on October 17, 1951, defendant, through her attorney, filed a request with the common council to withdraw the petition to demolish the building, and that thereafter the following occurred:

"On October 23, 1951, the common council referred the petition to the building department for comment.

"On October 31, 1951, the building department recommended that the petition be granted.

"On November 1, 1951, the city clerk forwarded the matter to the department of public works.

"On November 2, 1951, the department of public works acknowledged receipt of the communication and suggested obtaining an opinion from the corporation counsel as to possible legal liability to Midwest Wrecking Company for damages for breach of contract.

"On November 8, 1951, the corporation counsel filed an opinion that there had been no formal awarding of the contract to Midwest and that granting defendant's petition aforesaid would not render the

city liable for damage to Midwest Wrecking Company."

In our opinion the city of Detroit was not acting as an agent for defendant from July 25, 1951, to the time the building collapsed. It follows that during this period the building was either in the control of defendant or the city of Detroit. From the actions taken by the city, as above mentioned, the defendant had a right to assume that the building was going to be demolished under and by virtue of the authority of the city. Moreover, the defendant was legally prevented from repairing her building or correcting its dangerous condition by reason of a resolution by the common council adopted in 1947.

Under the circumstances in this case the control of the building, insofar as its demolition was concerned, was in the control of the city. It follows that defendant cannot be charged with the failure of the city to have the building demolished prior to its collapse. The judgment is affirmed, with costs.

BUTZEL, C. J., and CARR, BUSHNELL, BOYLES, REID, DETHMERS, and KELLY, JJ., concurred.