CONTINENTAL PAPER & SUPPLY COMPANY, INC v CITY OF DETROIT

Docket No. 100464. Argued November 7, 1995 (Calendar No. 5). Decided
    April 4, 1996. Rehearing denied *post*, 1240.

Continental Paper & Supply Company, Inc., and its insurer, brought a
    tort action against the City of Detroit in the Wayne Circuit Court on
    a theory of trespass-nuisance, alleging property damage caused by
    a fire that originated in adjacent buildings. At the time of the fire,
    the city did not have title to the buildings, but acquired title over a
    year later. The court, Marvin R. Stempien, J., entered judgment on a
    jury verdict for the plaintiffs. The Court of Appeals, JANSEN, P.J., and
    McDONALD and G. M. HOCKING, JJ., affirmed in an opinion per curiam,
    finding that there was sufficient evidence to allow a jury to deter-
    mine that the city possessed the requisite control over the premises
    to find it liable for failing to abate the nuisance (Docket No.
    141370). The city appeals.

    In an opinion by Justice WEAVER, joined by Chief Justice BRICKLEY,
    and Justices BOYLE and RILEY, the Supreme Court *held*:

    Because the city neither owned nor controlled the buildings, it
    cannot be held liable under the trespass-nuisance exception to gov-
    ernmental immunity for the damages caused by the fire.

    1. The trespass-nuisance exception to governmental immunity
    involves a trespass or interference with the use or enjoyment of
    land caused by a physical intrusion that is set in motion by the gov-
    ernment or its agents and results in personal or property damage.
    To establish trespass-nuisance, the plaintiff must show condition
    (nuisance or trespass), cause (physical intrusion), and causation or
    control by the government.

    2. In this case, condition and cause have been established. How-
    ever, the city did not own the abandoned warehouses because
    none of the detailed requirements for transfer of real property from
    the state to the city had taken place before the fire, nor did it con-
    trol the buildings by virtue of its efforts to have the buildings
    demolished so completely, to the exclusion of all others, as to be
    liable under a theory of trespass-nuisance for property it did not
    own. When the fire occurred the city was in the process of bidding
    to have the buildings demolished. It simply did not use the prop-
    erty, lease it, collect rents, exclude people from it, or invite people

onto it. Nor did it in any way prevent the owner from making any legal use of the property. Therefore, liability should not be imposed.

Justice CAVANAGH, concurring, stated that the holding in this case should be clearly narrowed to apply only to cases in which the government did not own or possess the property, and in which the only basis for alleged liability is its failure to act.

Reversed and remanded.

Justice MALLETT, joined by Justice LEVIN, concurring in part and dissenting in part, stated that once the city completed all the steps necessary to undertake demolition of the property, the jury reasonably could find that the city possessed sufficient control over the property for liability to attach under the trespass-nuisance exception to governmental immunity.

205 Mich App 404; 521 NW2d 844 (1994) reversed.

*Clausen, Miller, P.C.* (by *James T. Ferrini, Jeffrey J. Asperger, Joseph J. Janatka,* and *Edward M. Kay*), and *Robert H. Harkness* for the plaintiff.

*Phyllis A. James,* Corporation Counsel, and *Joanne D. Stafford,* Chief Assistant Corporation Counsel, for the City of Detroit.

WEAVER, J. The issue before us is whether the City of Detroit is liable under the trespass-nuisance exception to governmental immunity for damages caused by a fire that originated at buildings to which the city did not have title.[1] We hold that the city neither owned nor controlled the buildings and therefore cannot be held liable under the trespass-nuisance exception to governmental immunity. We reverse the judgment of the Court of Appeals and remand the case for entry of a judgment of dismissal.

On March 12, 1987, Continental Paper & Supply Company, Inc.'s, building was destroyed as the result of a fire set by an arsonist at an adjacent abandoned ware-

---

[1] Although the city did not have title to these buildings at the time of the fire, it did obtain ownership of them over a year later.

house complex. Title to this warehouse complex had
vested in the State of Michigan because of unpaid taxes.
Before the fire, the city had begun taking steps to have
the buildings condemned and demolished.[2] Continental
and its insurer filed a tort action for property damage
against the city on a theory of trespass-nuisance. The
jury entered a verdict of $2,986,000 in favor of plaintiffs.
The Court of Appeals[3] affirmed the award. This Court
then granted leave to appeal.[4]

This Court has recognized a limited trespass-nuisance
exception to governmental immunity. Trespass-nuisance
is "defined as trespass or interference with the use or
enjoyment of land caused by a physical intrusion that is
set in motion by the government or its agents and result-
ing in personal or property damage." To establish tres-
pass-nuisance the plaintiff must show "condition (nui-
sance or trespass); cause (physical intrusion); and cau-
sation or control (by government)." *Hadfield v Oakland
Co Drain Comm'r*, 430 Mich 139, 169; 422 NW2d 205
(1988).

Two elements, condition and cause, have been estab-
lished. See *Buckeye Union Fire Ins Co v Michigan*, 383
Mich 630; 178 NW2d 476 (1970). Thus, the only question
before us is whether plaintiffs established control of the
warehouses[5] by the city. The Court of Appeals found
that the evidence was "sufficient to allow a jury to
determine defendant possessed the requisite 'control'
over the premises such that defendant could be found
liable for failing to abate the nuisance."[6] We disagree.

---

[2] The city was acting under the authority found in Detroit Ordinance 290-H.

[3] 205 Mich App 404; 521 NW2d 844 (1994).

[4] 448 Mich 930 (1995).

[5] Plaintiffs have never contended that defendant caused the fire.

[6] *Id.* at 410.

Plaintiffs' theory of control is twofold. First, plaintiffs allege that the city "as a matter of reality" was the owner of the property. Second, plaintiffs contend that the city was in control of the warehouses by virtue of its efforts to have the buildings demolished.

We reject plaintiffs' first theory of control[7] because the city was not "as a matter of reality" the owner of the property. The record owners of the warehouse complex located at 2915 West Hancock Street were Clara K. Berger, A. Victor Bizer, and Samuel Berger, cotrustees (hereafter the Bergers). The Bergers apparently abandoned their property sometime in the early 1980's. Because the Wayne County 1982 taxes were not paid, the property was offered at the annual county tax sale on May 7, 1985.[8] The property was neither purchased nor redeemed. Therefore, title automatically vested in the state on May 6, 1986, subject to an additional six-month redemption period[9] and the procedures set forth in *Dow v Michigan*, 396 Mich 192; 240 NW2d 450 (1976).

On November 12, 1986, the City of Detroit filed an application for conveyance of all properties located in the city that the state had acquired during the year. On January 13, 1987, the state's deed to the property was recorded. The fire giving rise to this lawsuit occurred on March 12, 1987. On December 26, 1987, the state conducted the due process hearing required by *Dow v Michigan*, which extinguished any other person's prop-

---

[7]   Control may be found where the defendant creates the nuisance, owns or controls the property from which the nuisance arose, or employs another to do work that he knows is likely to create a nuisance. It may also be found where the governmental defendant is under a statutory duty to abate the nuisance. [*Baker v Waste Management of Michigan, Inc*, 208 Mich App 602, 606; 528 NW2d 835 (1995) (citation omitted).]

[8] The sale was made pursuant to the authority of MCL 211.61 *et seq.*; MSA 7.105 *et seq.*

[9] The redemption period is governed by MCL 211.140;  MSA 7.198.

erty rights in the warehouse complex. On April 1, 1988, the state conveyed title to the property to the City of Detroit.

Michigan's Legislature has provided detailed requirements for transfer of real property,[10] none of which took place before the fire. Despite plaintiffs' contention that at the time of the fire "all that remained was the paperwork" to effect a transfer of title to the city from the state, this Court will not accept plaintiffs' invitation to overturn centuries of certainty in real estate transactions.

Having rejected plaintiffs' first theory of control, we now evaluate plaintiffs' second theory of control. We hold that plaintiff did not establish control by pointing to the city's efforts to have the buildings demolished.

2 Restatement Torts, 2d, § 387, p 297 states:

> · An independent contractor or servant to whom the owner or possessor of land turns over the entire charge of the land is subject to the same liability for harm caused to others, upon or outside of the land, by his failure to exercise reasonable care to maintain the land in safe repair as though he were the possessor of the land.

We hold that it is this level of absolute control that the city must exercise in order to be liable under a theory of trespass-nuisance for property it does not own or possess.

On August 8, 1986, the city inspected the property and found that the property contained buildings that were in a dangerous and dilapidated condition. On October 10, 1986, the city issued a dangerous-building notice to the Bergers. On October 30, 1986, an administrative hearing was held, and the hearing

---

[10] See MCL 565.1 *et seq.*; MSA 26.521 *et seq.*

officer recommended that the Detroit City Council order demolition of the buildings. On December 4, 1986, the city council directed the Bergers to demolish the buildings and directed the city engineering department to let a contract for demolition. The city was in the process of bidding when the fire occurred.

Plaintiffs rely on *Oxenrider v Gvoic*, 340 Mich 591; 66 NW2d 80 (1954), to say that these actions show the city had taken complete control of the abandoned warehouses. In *Oxenrider*, the plaintiff's adjacent building was damaged when the building owned by the defendant collapsed. This Court found that the owner of the building was not liable for damages caused by the building's collapse because the city had taken complete control of the building. In *Oxenrider, supra* at 596-597, this Court found the key issue was "whether defendant was so excluded from possession and control of her property by the action of the city as to relieve her from legal obligation to demolish in whole or in part the dangerous structure." " 'The city had erected a bridge over the sidewalk, had taken out a building permit in its own name, had officially recognized the danger and had negotiated with a licensed wrecking company to the point of accepting its bid and authorizing a contract.' " It is significant that in *Oxenrider* the owner was legally prevented from repairing her building or correcting its dangerous condition. In the instant case the city ordinances do not so restrict the owner. *Oxenrider* did not hold that the city was in control of the property, only that the owner was relieved of liability because she was not in control of it.

The circumstances in *Hadfield v Oakland Co Drain Comm'r, supra*, are also strikingly different from the

case before us. In both the *Hadfield*[11] and *McCaul*[12] cases, a situation was presented where the governmental authority had specifically designed and built a facility to serve a purpose for the government and the individuals of the city.

In this case, the city simply did not use the property. At no point did the city lease the property, collect rents, exclude people from the property, or invite them onto it. Nor did the city in any way prevent the owner from making any legal use of the property. As a result, we find that the city had not taken control of the buildings to the exclusion of all others. Therefore, liability should not be imposed.

Our resolution on this key issue makes it unnecessary to address the other issues raised by appellant. We reverse and remand this suit to the trial court for entry of the appropriate order of dismissal.

BRICKLEY, C.J., and BOYLE and RILEY, JJ., concurred with WEAVER, J.

CAVANAGH, J. I concur in the result reached by the majority. I would, however, clearly narrow its holding so that it applies only to cases in which the government did not own or possess the property, and in which the *only*

---

[11] In *Hadfield*, the Court was presented with a plaintiff whose crops were damaged because of overflowing drains that were placed in the ground by the Oakland County Drain Commissioner. This plaintiff, along with other individuals, had complained on numerous occasions to the drain commissioner about the effectiveness of the drains. Periodically, the drains would fill with mud and overflow, flooding the farmer's fields. This Court found that there was evidence of a trespassory nuisance.

[12] In a companion case, *McCaul v Lake Odessa Village*, a similar action was presented. Lake Odessa Village had established a water treatment sewage plant next to the plaintiff's land. This plant was defective, and sewage flowed from the plant onto the plaintiff's land, causing damage. This Court found that there was sufficient evidence of a trespassory nuisance.

basis for alleged liability is its *failure* to act. A holding with respect to any other setting would be dicta in this case.

MALLETT, J. (*concurring in part and dissenting in part*). I agree with the majority that plaintiffs established both the condition and cause elements of a trespass-nuisance action. I disagree, however, with the majority's conclusion "that the city neither owned nor controlled the buildings and therefore cannot be held liable under the trespass-nuisance exception to governmental immunity."[1] I believe that, given the facts in this case, once the city completed all the necessary steps to undertake demolition of the property, the jury could reasonably find that the city possessed sufficient control over the property for liability to attach under the trespass-nuisance exception to governmental immunity. Consequently, I would affirm the Court of Appeals conclusion that the evidence presented was "sufficient to allow a jury to determine defendant possessed the requisite 'control' over the premises such that defendant could be found liable for failing to abate the nuisance." 205 Mich App 404, 410; 521 NW2d 844 (1994).

I

Michigan law provides that a municipal government is immune from tort liability when engaged in a governmental function.[2] Nevertheless, this grant of immunity is not absolute. Thus, the judiciary recognizes an excep-

---

[1] *Ante* at 163.

[2] Section 7 of the governmental tort liability act, MCL 691.1407(1); MSA 3.996(107)(1), states in pertinent part:

> Except as otherwise provided in this act, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function.

tion to the general rule of tort immunity for trespass-
nuisance actions. See, e.g., *Peterman v Dep't of Natural
Resources*, 446 Mich 177, 204-205; 521 NW2d 499 (1994)
(" 'It is well settled that a municipality has no more right
to invade or cause the invasion of private property than
an individual.' . . . The government, therefore, 'cannot
excuse its tortious taking of private property by invok-
ing the shibboleth of governmental function' "). See also
*Hadfield v Oakland Co Drain Comm'r*, 430 Mich 139;
422 NW2d 205 (1988).

To succeed under the trespass-nuisance exception, a
plaintiff must show "condition (nuisance or trespass);
cause (physical intrusion); and causation or control (by
government)." *Hadfield, supra* at 169. Causation or con-
trol, in turn, exists if the governmental entity has "either
created the nuisance, owns or controls the property
from which the nuisance arose, or employed another
that it knows is likely to create a nuisance." *Kuriakuz v
West Bloomfield Twp*, 196 Mich App 175, 177; 492 NW2d
757 (1992). There is no dispute that the condition and
cause elements are satisfied in this case. This case turns
on a determination whether the city sufficiently con-
trolled the Hancock property so that liability could
attach under a trespass-nuisance theory.[3]

As an initial matter, while I do not endorse the major-
ity's definition of control, I believe that the facts in the
instant case would support a finding of control by the
city even under that definition. Citing 2 Restatement
Torts, 2d, § 387, p 297, the majority indicates that a

---

[3] Plaintiff does not argue that the city created or employed another
who created the nuisance, i.e., that the city caused the nuisance. Likewise,
I agree with the majority that the city did not own the property. The
majority correctly states that only the titleholder of the property can be
its owner. Because the city did not hold title to the property at the time of
the fire, the plaintiffs cannot establish control through ownership. Owner-
ship, however, is only one means by which one can control property.

party takes control of property and is therefore subject to liability as though a possessor, at the point "the owner or possessor of land turns over the entire charge of the land" to the third party.[4]

In this case, there was no neat, formal agreement that transferred control of the Hancock property from the Bergers to the city. Nevertheless, I believe that the actions of the Bergers and the city effected every bit as much of a transfer of control as if they had mutually agreed on a transfer of control of the Hancock property to the city for purposes of demolition. The facts adequately justify the conclusion that the Bergers abandoned the property, effectively relinquishing all control over the property.[5] To complete the "transfer" of control, the city stepped in and undertook all steps necessary to permit it to demolish the warehouse complex and thereby accepted control over these abandoned premises.[6] Effectively, as of the date of the city demolition

---

[4] *Ante* at 166.

[5] The Hancock property was offered at a tax sale on May 7, 1985, for nonpayment of taxes by the Bergers. Title vested in the state on May 6, 1986, subject to a six-month redemption period. The Bergers did not redeem. The city began the administrative process for demolition on August 8, 1986, with the initial inspection of the Hancock property. The Bergers did not respond to any notices to repair or demolish the Hancock property. The Bergers did not attend the first administrative hearing, nor did they attend the city council hearing. The Bergers did not respond to the city council resolution directing them to demolish the Hancock buildings.

[6] The city initiated the first step in the administrative process when it inspected the property in response to a citizen complaint. This was done on August 8, 1986, by Inspector Polk of the City Building Department. Under city ordinance 290-H, § 12-11-28.4, Inspector Polk determined that the Hancock premises were dangerous and issued notice to the owner of record to appear at a hearing to show cause why the building should not be demolished or made safe.

The city initiated the second step when it issued a dangerous building notice to the last owner of record on October 10, 1986. This notice directed the owner to make the necessary repairs and advised of an administrative hearing on October 30, 1986, regarding the status of the property. The owners did not appear or otherwise respond to the notice.

order, December 4, 1986, the city had the power to enter the property and destroy the warehouses. As a result, I believe that even under the majority's rule, there was, in effect, a transfer of control to the city.

---

On October 10, 1986, the building department filed a lis pendens to notify interested parties that legal proceedings had been commenced to demolish the Hancock buildings. The department inspected the property on October 30, 1986, to determine if the owners had cured the dangerous condition. The inspection revealed that the buildings were never repaired or barricaded. None of the inspections revealed an immediate danger of failure or collapse that would endanger life; therefore, the department was not authorized to take emergency measures to render the buildings safe.

The city initiated the third step when it conducted the administrative hearing on October 30, 1986. The hearing officer was required to "render his decision either closing the proceedings or ordering the building or structure to be demolished, repaired or otherwise made safe." Section 12-11-28.4. The owner, if present at the hearing, had the right to appeal the hearing officer's decision to the board of appeals. Section 12-11-32.0. If the owner did not appear, or refused to act in accordance with the ruling, the officer was required to file his findings with the city council. Because no owner appeared, the hearing officer recommended that the city council order the demolition of the Hancock property. On November 19, 1986, the department mailed notice to the record owners that demolition was recommended. The department reinspected the property on November 26, 1986.

The city initiated the fourth step when it conducted a show-cause hearing before the city council. The owner of record was notified of this hearing and it was published in the Detroit Legal News. A show-cause hearing was conducted before the city council on December 4, 1986. The record owner did not appear, and the council ordered the buildings demolished with costs assessed against the property. The city council resolution and notice directed the record owner of the Hancock property to demolish the buildings. It also directed the city engineering department to proceed with demolition.

After the completion of these four administrative steps, the evidence indicates that the city engineering department had the power to demolish the buildings without any further council action. The power to demolish remained in control of the engineering department unless and until the property owner regained control by requesting to demolish the property himself. Because the property was abandoned by the private owner, was in the hands of the state, and the city had applied to acquire it, it was reasonable for the jury to conclude that there was no chance that the owner would return to demolish the property and that, effectively, the city assumed control of the property.

In any event, I believe the majority construes the term "control" too narrowly. The majority would require that, before control could exist, the city would have to make some positive use of the land. Thus, the majority states:

> In this case, the city simply did not use the property. At no point did the city lease the property, collect rents, exclude people from the property, or invite them onto it. Nor did the city in any way prevent the owner from making any legal use of the property. As a result, we find that the city had not taken control of the buildings to the exclusion of all others.[7]

While the uses listed by the majority may evidence control, I believe that they do not represent the only uses that can evidence control on the part of the city. Indeed, the uses cited by the majority conveniently ignore the very nature of the Hancock property.[8] Instead, I believe that given the facts in this case, once the city completed all the steps necessary to undertake demolition of the property, the jury could

---

[7] *Ante* at 168.

[8] Most of the activities listed by the majority would never occur on the abandoned piece of property that exists in this case. There was nothing to lease but a vacant fire trap. The fact that the property could not be sold through a tax sale, but rather escheated to the state, suggests that there were no rents to be derived from this property. There was no positive use that anyone could make of this dangerous string of warehouses. It is true that the city did not attempt to exclude anyone from the property. It is equally true, however, that this is precisely what the city should have done to avoid the disaster that initiated this case.

Furthermore, I find that the city did, in fact, invite others onto the property through the solicitation of bids for demolition work. The city had every legal right to solicit such bids and had every intention of following through and engaging a demolition contractor.

As a final matter, I find a lack of significance in the fact that the city did not prevent the owner from making legal use of the property because, as a practical matter, a jury could conclude there was no owner in this case. See part II.

reasonably find that the city possessed sufficient control over the property for liability to attach under the trespass-nuisance exception to governmental immunity.

II

I believe that the result I reach is supported by the only previous case in which this Court considered the scope of the term control with respect to a municipality, albeit indirectly, for purposes of the trespass-nuisance exception. *Oxenrider v Gvoic,* 340 Mich 591; 66 NW2d 80 (1954).[9] In *Oxenrider,* the plaintiff sued a private landowner in a nuisance action for damage caused to his property from the collapse of the landowner's neighboring buildings. The defendant landowner owned a series of old buildings that the city building department found to contain serious structural defects. After unsuccessfully directing the landowner to repair the structural defects, the city voted by resolution to demolish the buildings.[10] Consequently, the Department of Public Works was directed by a city resolution to take immedi-

---

[9] I agree with the majority that *Hadfield v Oakland Co Drain Comm'r* and its companion case *McCaul v Lake Odessa Village,* do not assist the Court in its determination whether control exists for purposes of the trespass-nuisance exception under the instant facts.

In *Hadfield,* this Court found an actionable trespass-nuisance because "[t]he interference was a physical intrusion onto private property that was *caused* by the county drain commissioner's actions or failure to act." *Id.* at 184 (emphasis added). Because the Court found that the municipality "caused" the nuisance, it did not need to determine if the government otherwise "controlled" the nuisance.

In *McCaul,* this Court stated, "[w]hether there are sufficient allegations of the existence of a nuisance or of defendant's control over the creation of the nuisance are not in dispute here." *Id.* at 203. All this Court decided was whether the "plaintiffs' complaint, read as true, states a claim that conforms to the exception" for purposes of overcoming the defendant's motion for summary disposition. *Id.*

[10] The owner attempted to repair her buildings, but all her attempts failed.

ate action to dismantle the upper portions of the defendant's buildings.

One month later, the department notified the tenants to vacate the buildings. A month after that, the department had completed all the administrative steps necessary to demolish the buildings. On a determination that outside professional help was needed, the city solicited bids from private demolition crews. The city authorized a contract with one of the demolition crews, but no contract was signed with any of the crews. Approximately one week later, the buildings completely collapsed causing damage to the plaintiff's neighboring property.

In *Oxenrider*, this Court framed the issue as "whether defendant was so excluded from possession and control of her property by the action of the city as to relieve her from legal obligation to demolish in whole or in part the dangerous structure." *Id.* at 596. This Court placed significance in the fact that the city resolved to demolish the buildings. *Id.* at 601. It reasoned that because of the city's actions toward the property, "the defendant had a right to assume that the building was going to be demolished under and by virtue of the authority of the city." *Id.*

In *Oxenrider*, this Court plainly stated that the building on the property was "either in the control of defendant or the city of Detroit." *Id.* The Court then held that the landowner was not in control of the property, from which one can only infer that the city controlled the property.[11] Indeed, this Court stated that the property

---

[11] While it is true, as the majority points out, that this Court in *Oxenrider* did not directly hold that the city was in control of the property, it is also true that the city's liability was not at issue in that case. Given that this Court stated that either the city or the private owner had control, and given that this Court found the private owner not liable, I am certain that, had the city's control been at issue, this Court would have found that such control existed.

owner was not liable for a nuisance on its property because the property, "insofar as its demolition was concerned, was in the control of the city." *Id.*

I find that the facts in the instant matter nearly overlap those in *Oxenrider.* In the instant case, as in *Oxenrider,* the city became aware of and inspected the vacant Hancock buildings. In both cases, the city posted multiple notices on the buildings instructing the landowner either to secure or demolish the dangerous buildings. In *Oxenrider,* the landowner did not sufficiently repair the buildings, so the city undertook administrative proceedings on its own initiative that permitted it to demolish the buildings.[12] In the instant case, no action was taken by the landowners or their agents, so the city also obtained a demolition resolution.[13]

---

[12] I do not find significance in the fact that the city in *Oxenrider* "erected a bridge *over the sidewalk in front* of defendant's building for the protection of pedestrians" since the sidewalk was owned by the city. *Id.* at 594 (emphasis added). Nor do I see this as a determinative factor in the *Oxenrider* holding.

[13] The City of Detroit had the authority to destroy dangerous buildings under Detroit Ordinance 290-H. This ordinance provides procedures to undertake demolition proceedings by city council resolution.

> Resolved. That the findings and determination of the Buildings and Safety Engineering Department that certain structures on premises known as . . . 2915 W. Hancock (101), . . . (102), . . . (103), . . . (104), . . . (105), . . . are in a dangerous condition and should be removed . . . and be it further Resolved. That the City Engineering Department be and it is hereby authorized and directed to take the necessary steps . . . for the removal of dangerous structures at . . . 2915 W. Hancock (101), . . . (102), . . . (103), . . . (104), . . . (105), . . . .

After this resolution passed, no further notices were sent to anyone, including the previous owners, regarding the city's action with respect to the abandoned property.

The city indicated its intent to take legal control of the Hancock property by issuing a lis pendens.[14] After a city resolution authorizing demolition was obtained, the engineering department surveyed the Hancock property to estimate the demolition costs. As in *Oxenrider*, the city solicited bids to demolish the Hancock property from demolition crews to demolish the buildings, but had not yet signed a demolition contract.[15] As in *Oxenrider*, the city had the authority to demolish under a city ordinance, having successfully completed all administrative requirements necessary to demolish the buildings.

The majority attempts to distinguish *Oxenrider* in part because there the landowner was "legally prevented from repairing her building or correcting its dangerous condition . . . ." *Id.* at 601.[16] This effort fails, however,

---

[14] The following was the trial testimony of City of Detroit Inspector James Polk that described a lis pendens as "taking legal control" over the property.

Q. You described it [the document] as a *lis pendens*, which is a legal term, isn't it?

A. Right.

Q. Okay. And that says that the City has taken some action legally with respect to that property. They've taken some legal control over it?

A. That's correct.

Q. And in this case the legal control over the property was that the City has notified the owners that it was going to proceed with demolition?

A. Right.

Q. Is that correct?

A. That is correct.

[15] The majority assigns weight to the fact that the city had authorized a contract with the contractor who presented the lowest bid. Again, I do not see this as determinative, because the city engineering department had full authority to demolish upon completion of the four administrative steps. See n 6.

[16] It is unclear from the *Oxenrider* opinion why the property owner was prevented from demolishing her property on her own. However, given her previous history of poor compliance with the city's directives to

because unlike *Oxenrider*, the owner in the instant matter was, for all practical purposes, nonexistent. Given a completely absent owner, the city stepped in and took control of the Hancock property by way of its demolition powers. At that point, a jury could reasonably conclude that the city had control over the property for purposes of demolition.[17]

As in *Oxenrider*, the city in the instant case had taken all the necessary steps and had the authority to initiate demolition proceedings on the property at any time. The city had completed all necessary administrative hearing and notice procedures, and the city council had voted by resolution to demolish the building.[18] At this point, authority over the property transferred to the city engineering department, the department in charge of demolition. The deputy director of the city engineering department testified that when the property came to his department for demolition, the private owner was no longer involved in the property. For these reasons, I

---

repair her unsafe property, one can only speculate that the city had concern with the owner's ability to properly demolish the buildings.

In the instant case, even if the owner had appeared, the city had authority equivalent to that of the city in *Oxenrider*, e.g., the testimony of Ronald Hamilton, supervisor of the dangerous buildings unit, suggests that the city could have prevented the owner from taking over demolition upon a finding by the city that the owner was incapable of making the property safe.

Furthermore, I find the ability of the owner to repair is insignificant because even the majority's rule based on the 2 Restatement Torts, 2d, § 387, does not require an absolute and irrevocable grant of control.

[17] This concept is further strengthened under the facts of this case because the city had affirmatively applied for, and was in the process of obtaining, title to the Hancock property. Furthermore, the testimony at trial indicated that property not sold at a tax sale is available to the city. It does not appear that the state ever rejects the city's request for transfer of title of abandoned property. Coincidentally, the city obtained title to the property sometime after the fire.

[18] See n 6.

believe that the instant case is substantially similar to *Oxenrider.*

Consequently, given this Court's opinion in *Oxenrider*, I believe that a jury may reasonably conclude that the facts in this case support a finding that the city had sufficient control for purposes of trespass-nuisance liability.

### III

I believe that public policy further justifies the result I would reach in this matter. It is important, especially in an urban setting such as Detroit, that someone be held responsible for every piece of real estate.

> "Public policy in a civilized community requires that there be someone to be held responsible for a private nuisance on each piece of real estate, and, particularly in an urban area, that there be no oases of nonliability where a private nuisance may be maintained with impunity." [*Buckeye Union Fire Ins Co v Michigan*, 383 Mich 630, 643-644; 178 NW2d 476 (1970), quoting *Kurtigian v City of Worcester*, 348 Mass 284, 291; 203 NE2d 692 (1965).]

Given the amount of abandoned property in Detroit, we should avoid creating oases of nonliability.

In the case of abandoned property, liability for nuisance should lie with the private owner of the property, absent sufficient evidence of control by a third party. Because such control existed in this case, however, this Court should allow the jury verdict to stand.

LEVIN, J., concurred with MALLETT, J.