# Order

Michigan Supreme Court
Lansing, Michigan

April 11, 2007

127660 & (97)

Clifford W. Taylor,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman,
Justices

JOYCE MCDOWELL, as Personal
Representative of the estates of
BLAKE BROWN, JOYCE BROWN,
and CHRISTOPHER BROWN, deceased,
and as Conservator for JONATHON FISH,
JOANNE CAMPBELL, and JUANITA FISH,
       Plaintiff-Appellee,

v

CITY OF DETROIT and the
DETROIT HOUSING COMMISSION,
       Defendants-Appellants.
_____/

SC: 127660
COA: 246294
Wayne CC: 00-030668-NO

On order of the Court, leave to appeal having been granted, and the briefs and oral argument of the parties having been considered by the Court, we hereby REVERSE the judgment of the Court of Appeals and REMAND this case to the Wayne Circuit Court for entry of a judgment in favor of defendants. "Except as otherwise provided in [the governmental immunity] act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." MCL 691.1407(1). The interpretation of the governmental tort liability act set forth in *Hadfield v Oakland Co Drain Comm'r,* 430 Mich 139 (1988), applies to all cases brought on or before April 2, 2002, which includes the instant case. *Pohutski v City of Allen Park,* 465 Mich 675, 699 (2002). As plaintiff concedes, the Court of Appeals erred in holding that negligent nuisance is an exception to governmental immunity under *Hadfield.* The Court of Appeals also erred in holding that plaintiff presented sufficient evidence to create a genuine issue of material fact allowing plaintiff to proceed with the cause of action for trespass nuisance. Because the fire started within the walls of the leased apartment and a lease of an apartment includes the walls of that apartment, *Forbes v Gorman,* 159 Mich 291, 294 (1909), there was no trespass or any other physical

intrusion into the apartment on the part of the defendant.[1]  The provision of the lease that prohibited the lessee from making any "alterations or repairs or redecoration to the interior of the Premises or to install additional equipment or major appliances without the written consent of Management" did not exclude from the lease the space within the walls; it merely regulated the lessee's activities with respect to this space.  If plaintiff's argument to the contrary was to prevail, this would mean that the lessee had no right of possession over *any* of the apartment because the lessee could not make any alterations or repairs anywhere within the apartment without the lessor's consent.[2]

In this case, plaintiff seeks a stay of proceedings until final disposition of pending federal litigation, wherein plaintiff's counsel initiated a lawsuit challenging the constitutionality of the Michigan Supreme Court recusal rule.  See *Fieger v Ferry*, 471 F 3d 637 (CA 6, 2006).

---

[1] The dissent criticizes the majority for focusing on the fact that the fire started within the walls and ignoring the fact that the fire started because of faulty electrical wiring, and that defendant had a contractual and statutory duty to maintain the electrical wiring.  First, we want to make perfectly clear that the fact that the fire started within the walls is completely uncontested.  Plaintiff's brief states, "Fire broke out from inside the north wall," and plaintiff's experts "confirmed that the fire originated in the interstitial space of the north wall."  Plaintiff's brief at 4, 5.  Second, contrary to the dissent's contention, we do not contend that "the walls were the source or cause of the fire."  *Post* at 4 n 3.  Instead, we simply state the uncontested fact that the fire started within the walls.  Third, the issue here is *not* whether faulty electrical wiring caused the fire or whether defendant violated a contractual or statutory duty to maintain the electrical wiring.  Rather, the issue is whether the governmental immunity act of this state immunizes defendant from liability, or, more precisely, whether the fire allegedly caused by defendant's negligence "trespassed" onto plaintiff's apartment.  Because the fire started within the walls of plaintiff's own apartment, the fire cannot be said to have "trespassed" onto her apartment.

[2] Contrary to the dissent's contention, it is the dissent's position that "defies logic"; under its rationale, *no* lessee would *ever* have the right to possess the leased premises if the lease contained *any* restriction on the lessee's use of the premises.  Further, we do not hold, as the dissent suggests, that "a tenant's permission to live in a space negates the landlord's ownership and control over the premises and exonerates the landlord from liability for unsafe conditions."  *Post* at 6 n 4.  Rather, we simply hold that a fire that starts within the walls of an apartment does not "trespass" onto the apartment when it spreads throughout the apartment within the meaning of the trespass nuisance exception to governmental immunity.  That is, we are not holding that *no* landlord would ever be liable under these circumstances, but only that the governmental immunity act immunizes *this* defendant from liability under these circumstances.

In the recent past, plaintiff's counsel has filed numerous motions for the recusal of one or more Michigan Supreme Court Justices, either in his capacity as a party or as an attorney on behalf of his clients. Each of the prior motions for recusal has involved various allegations of claimed bias, principally stemming from Michigan Supreme Court judicial campaigns. All of the previous motions for recusal have been denied. *Graves v Warner Bros*, 469 Mich 853 (2003); *Gilbert v DaimlerChrysler Corp*, 469 Mich 883 (2003); *Harter v Grand Aerie Fraternal Order of Eagles*, 693 NW2d 381 (2005); *Grievance Administrator v Fieger*, 472 Mich 1244 (2005); *McDowell v City of Detroit*, 474 Mich 999 (2006); *Stamplis v St John Health Sys*, 474 Mich 1017 (2006); *Heikkila v North Star Trucking*, Inc, 474 Mich 1080 (2006); and *Lewis v St John Hosp*, 474 Mich 1089 (2006).

The pending motion to stay this case asserts no new basis for recusal. Rather, the motion is predicated entirely on allegations made in the previous eight motions that have been considered and denied.

As we have each done in connection with these past motions, and as Justices must do in connection with every motion for disqualification, we have each looked into our consciences in this case and concluded that we are able to accord fair, impartial and equal treatment to plaintiff's counsel and his clients.

Further, the motion is predicated on the erroneous notion that disqualification of a Justice of the Michigan Supreme Court is governed by the disqualification procedure set forth in MCR 2.003. On the contrary, this procedure has never been held applicable to disqualification of Justices. See, e.g., *Adair v State of Michigan*, 474 Mich 1027, 1043 (2006) (statement of Cavanagh, J.), 1029 n 2, (statement of Taylor, C.J., and Markman, J.); *In re JK,* 468 Mich 202, 220 (2003) (statement of Weaver, J.). Throughout its history, the disqualification procedure followed in the Michigan Supreme Court is similar to the one followed in the United States Supreme Court. See Statement of Recusal Policy, United States Supreme Court, November 1, 1993; *Laird v Tatum*, 409 US 824, 833, 837; 93 S Ct 7; 34 L Ed 2d 504 (1972); *Jewell Ridge Coal Corp v Local 6167*, 325 US 897; 65 S Ct 1550; 89 L Ed 2007 (1945) (Jackson, J., *concurring*).

There being no new asserted basis that would warrant a stay of proceedings, the motion is DENIED.

CAVANAGH, J., dissents and states as follows:

I dissent from the order reversing the judgment of the Court of Appeals in this case. As a preliminary matter, I would grant plaintiff's motion for a stay of proceedings in this case. Litigation regarding the constitutionality of this Court's recusal procedures is currently pending in the federal court system. See *Fieger v Ferry*, 471 F3d 637 (CA 6, 2006) (reversing the United States District Court for the Eastern District of Michigan

and remanding the case to that court for further proceedings). Because plaintiff has asked several justices to recuse themselves from participating in this case, and those justices have declined to do so, the most prudent course of action would be to await the final disposition of the federal suit.

Regarding the substance of the majority's order, the majority is simply wrong to base its conclusion that there was no trespass on its observation that "the fire started within the walls of the leased apartment . . . ." *Ante* at 1. By failing to examine more precisely where the fire began and the source of that fire, the majority erroneously denies any possibility of recovery for the tragic and preventable deaths of six children.

Indisputably, the fire began in an electrical outlet because of faulty wiring in that outlet.[3] While the wiring to the outlet was "within the walls," the walls of plaintiff's apartment did not spontaneously combust. Rather, the faulty electrical wiring, which the tenant had pleaded with defendants many times to fix, ignited, causing the walls to burn. And not only did the tenant not have control of the electrical wiring, the tenant's contract also *specifically placed the duty of maintaining the electrical systems on defendants*. Critically, section VII(A)(1) of the lease imposed the following contractual obligations on defendants:

> a. Repair and maintain the dwelling unit, equipment and appliances, and the common areas and facilities which are needed to keep the housing in decent, safe and sanitary condition.

> b. Comply with all requirements of applicable state and local building and housing codes and HUD regulations concerning matters materially affecting the health or safety of the occupants.

---

[3] The majority proclaims that because plaintiff's brief states that the "'[f]ire broke out from inside the north wall'" and that an expert testified that "'the fire originated in the interstitial space of the north wall,'" *ante* at 2 n 1, the analysis must center on the walls of the tenant's apartment. Neither plaintiff's nor the expert's statement denies or conflicts with the expert's testimony that the *source* of the fire was the electrical wiring. (Nor do the statements the majority points to conflict with common sense or logic). The electrical wiring was inside the wall; thus, the expert naturally stated that the fire originated inside the walls. Then, as fires do, the fire spread throughout the interstitial wall space and "broke out" into the apartment "from inside" the wall. Neither plaintiff nor either of her experts ever contended that the walls were the source or cause of the fire. That is the majority's fiction alone.

Further, while I agree with the majority that the question is whether the government is immune from liability for this horrendous event, I simply conclude that it was not immune under the correct analysis.

      c. Keep development buildings, facilities, and common areas, not otherwise assigned to Residents for maintenance and upkeep, in a clean and safe condition.

      d. Maintain electrical, plumbing, sanitary, heating, ventilating and other facilities and appliances, supplied or required to be supplied by Management in good and safe working order and condition.

* * *

      k. Respond to and satisfy Resident's damage claims, unless Management determines that Resident's damage(s) or loss was not caused by Management but by theft or casualty, among other things, in which case Management shall not be liable.

Obviously, the tenant neither installed nor maintained the electrical wiring within her apartment, which wiring, it is worth noting, was part of an electrical system serving an entire building. And it is self-evident that the tenant did not have the right to alter or otherwise interfere with the apartment building's electrical system. Clearly, defendants, not the tenant, had control and dominion over the electrical wiring. Of course, the majority does not opine, nor did defendants argue, that the tenant controlled the wiring, for such a conclusion would be difficult to sustain indeed. Rather, the majority turns a blind eye and proclaims instead that the fire began "within the walls." *Ante* at 2 n 1. That red herring of a conclusion blatantly ignores the true origin of the fire as shown by expert testimony, through which it was established that the fire originated *inside the electrical outlet* as the result of electrical "arcing," which, in turn, "ignite[ed] fuels in the wall space including, but not limited to, any insulating materials that were in there that may have had a combustible component . . . ." Thus, the majority's dismissal of this case based on its interpretation of law regarding control over walls is truly egregious.

But the majority errs again in stating that "a lease of an apartment includes the walls of that apartment" because it cannot be said that the tenant had a right of control that in any way negated defendants' duties, despite the majority's citation of *Forbes v Gorman*, 159 Mich 291 (1909). In *Forbes*, this Court stated, "[s]uch lessee obtains the right, *in the absence of restrictions, to use such premises*, including the walls, for all purposes not inconsistent with the lease. He acquires the right to the use of the outer walls, and can put any sign or signs thereon which work no injury to the freehold. . . ." *Id.* at 294 (emphasis added). Because the area of inquiry in *Forbes* was the roof of the subject building, this Court's comment with respect to the walls might be considered obiter dictum. But even were the principle announced in *Forbes* given full force, the lease in the present case contained restrictions regarding the walls, as noted by the majority, and *Forbes* explicitly excepted such restrictions from its analysis. The majority defies logic by asserting that the lease contemplated restricting only the

tenant's use of the outer surface of the wall, while leaving intact her right to control and alter the *inner space between* the walls.[4]

In *Hadfield v Oakland Co Drain Comm'r*, 430 Mich 139 (1988), this Court set forth the elements of trespass-nuisance as "condition (nuisance or trespass); cause (physical intrusion); and causation or control (by government)." *Id.* at 169. It is well established that a fire hazard that the government allows to remain is a nuisance, *Buckeye Union Fire Ins Co v Michigan*, 383 Mich 630, 643 (1970), and that fire is a physical intrusion, *Continental Paper & Supply Co, Inc v Detroit*, 451 Mich 162, 164 (1996). In *Continental Paper* this Court stated:

> Control may be found where the defendant creates the nuisance, owns or controls the property from which the nuisance arose, or employs another to do work that he knows is likely to create a nuisance. It may also be found where the governmental defendant is under a statutory duty to abate the nuisance. *Baker v Waste Management of Michigan, Inc*, 208 Mich App 602, 606; 528 NW2d 835 (1995) (citation omitted). [*Id.* at 165 n 7.]

As the Court of Appeals properly recognized, but the majority neglects to acknowledge, MCL 554.139 mandates landlords to keep premises "fit for the use intended by the parties" and "in reasonable repair . . . and . . . comply with the applicable health and safety laws of the state and of the local unit of government where the premises are located . . . ." MCL 554.139(1)(a), (b). Likewise, MCL 125.471 requires that "[e]very dwelling and all the parts thereof including plumbing, heating, ventilating *and electrical wiring* shall be kept in good repair *by the owner*." (Emphasis added.) Defendants were on actual notice of the problems with the electrical outlet that eventually caught fire and other electrical components of the home as evidenced by nearly two years' worth of complaints made by the tenant to defendants. For instance, the tenant informed defendants that sparks would fly from lights in the basement and kitchen, the thermostat shot flames and made popping noises, and the subject outlet sparked, fumed, and smelled like burning paper when the tenant would plug in appliances.

---

[4] The majority's statement that under my rationale, no lessee could ever "possess" his premises, *ante* at 2 n 2, obfuscates the real issue. "Possession," in this context, has a meaning entirely different than "ownership" or "control." See, e.g., *Continental Paper & Supply Co, Inc v Detroit*, 451 Mich 162, 165 n 7 (1996). It is the majority's failure to recognize this difference that leads to its erroneous conclusion that a tenant's permission to live in a space negates the landlord's ownership and control over the premises and exonerates the landlord from liability for unsafe conditions.

The wisdom of *Continental Paper* is well-suited to this case. Defendants unquestionably owned the premises from which this nuisance arose and retained the right of complete control over the electrical system, which malfunctioned. Further, defendants knew of the dangerous condition, and failed to fix it, despite their contractual and statutory obligations to do so. The fact that a landlord may "regulate" uses of its leased premises is, in my view, irrelevant to the question of trespass-nuisance as that question pertains to ownership and control.

Further, I find that the reasoning used throughout cases addressing nuisance applies with full force to the case at hand. Namely, this Court has soundly reasoned that to allow the government to escape liability for harm resulting from a nuisance it controls "would allow the state an absolute right to use its property in any manner it may choose without regard for the public at large or private persons." *Hadfield*, supra at 208 (opinion of Boyle, J.), citing *Gerzeski v State Highway Dep't*, 403 Mich 149, 169 (1978) (Ryan, J., dissenting). The carte blanche to the government of which *Hadfield* warned is, unfortunately, established by the majority in this case.

The focus of the majority on who owned or controlled the walls or the space between the walls is gravely misplaced. The majority should acknowledge that the correct analysis asks who owned, controlled, and had a duty to maintain *the electrical wiring*. Here, the duty to maintain the wiring, as well as ownership and control over it, was unequivocally defendants'. Defendants failed abysmally in their obligations, and six children died. Accordingly, I would affirm the judgment of the Court of Appeals and let the victims of defendants' neglect have their day in court.

WEAVER and KELLY, JJ., join the statement of CAVANAGH, J.

WEAVER, J., dissents and states as follows:

I join Justice Cavanagh's dissenting statement in this case. I write further to state that I dissent from the participation of the majority of four, Chief Justice Taylor and Justices Corrigan, Young, and Markman in this case, where Mr. Geoffrey N. Fieger's law firm represents the plaintiff. For my reasons in detail, see my dissent in *Grievance Administrator v Fieger,* 476 Mich 231, 328-347 (2006) (Weaver J., dissenting), and my dissent to the denial of the motion for stay in *Grievance Administrator v Fieger,* 477 Mich 1228, 1231-1271 (2006) (Weaver, J., dissenting).

I also dissent from the order denying plaintiff's motion for stay of proceedings pending Mr. Fieger's lawsuit in the United States District Court for the Eastern District of Michigan concerning Michigan's disqualification rules for Supreme Court justices. See *Fieger v Ferry*, 471 F3d 637 (CA 6, 2006). I would grant the motion to stay.

Furthermore, although MCR 2.003 is inadequate and in need of reform, which reform I have urged,[5] without success for almost 4 years, this Court to undertake action and achieve, the disqualification of justices is governed by the disqualification procedure contained in MCR 2.003. Although the majority of four asserts the contrary, the past four years have exposed inconsistencies in the standards that individual justices apply to themselves when making their decision to participate, or not to participate, in a case. At times the justices have applied the court rule governing the disqualification of judges, MCR 2.003, to themselves, and at times they have not.

For example in *Adair v Michigan,* 474 Mich 1027, 1043 (2006), Chief Justice Taylor and Justice Markman stated that "[p]ursuant to MCR 2.003(B)(6), we would each disqualify ourselves if our respective spouses were participating as lawyers in this case, or if any of the other requirements of this court rule were not satisfied." Justice Young concurred fully in this legal analysis. *Id.* at 1053. Similarly, in *Grosse Pointe Park v Michigan Municipal Liability & Prop Pool,* 473 Mich 188 (2005), then-Chief Justice Corrigan used the remittal of disqualification process of MCR 2.003(D). At other times, however, the same justices have not followed the provisions of MCR 2.003. For example, in *Gilbert v DaimlerChrysler Corp,* 469 Mich 883, 889 (2003), then-Chief Justice Corrigan and Justices Taylor, Young, and Markman denied a motion for reconsideration of the Court's order denying the motion for disqualification and did not refer the motion to the State Court Administrator for the motion to be assigned to another judge for review de novo, as would be proper under MCR 2.003(C)(3).

Assertions that justices can continue to look into their consciences and conclude they are able to accord fair, impartial, and equal treatment to parties' counsel and clients without any independent check on justices' decisions are incorrect. This method is insufficient and inadequate to meet the due process rights of parties and their counsel. Further while it appears to continue to be for *some* justices a "tradition" of this Court for a justice who disqualifies himself or herself from a case to not give written reasons, and to sometimes apply MCR 2.003 to himself or herself, and to sometimes not, it is a

---

[5] Since May 2003, I have repeatedly called for this Court to recognize, publish for public comment, place on a public hearing agenda, and address the need to have clear, fair, orderly, and public procedures concerning the participation or disqualification of justices. See, e.g., statements of Weaver, J., in *In re JK,* 468 Mich 202 (2003); *Gilbert v DaimlerChrysler Corp,* 469 Mich 883 (2003); *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 472 Mich 91 (2005); *McDowell v City of Detroit,* 474 Mich 999 (2006); *Stamplis v St John Health Sys*, 474 Mich 1017 (2006); *Heikkila v North Star Trucking, Inc,* 474 Mich 1080 (2006); *Lewis v St John Hosp,* 474 Mich 1089 (2006); *Adair v Michigan,* 474 Mich 1027 (2006); *Grievance Administrator v Fieger,* 476 Mich 231 (2006)*; Grievance Administrator v Fieger*, 477 Mich 1228 (2006); *People v Parsons*, Docket No. 132975 (2007); *Ruiz v Clara's Parlor*, Docket No. 130847 (2007); and *Neal v Dep't of Corrections*, 477 Mich ___ (Docket No. 130862, issued March 23, 2007).

"tradition of secrecy" and inadequacy that must for *all* justices end now. An impartial judiciary is "ill served by casting a cloak of secrecy around the operations of the courts . . . ."[6]

---

[6] *Scott v Flowers*, 910 F2d 201, 213 (CA 5, 1990).



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

April 11, 2007

_____
Clerk

t0404